IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

vs.                                                   Case No. 20-cr-137-wmc

MICHAEL EISENGA,

                              Defendant.

RENEWED MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR
COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)

Comes now Michael Eisenga, defendant in this matter, by and through Counsel, and

hereby respectfully move pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) for a reduction in sentence

supervised release with the imposition of appropriate conditions.

1.       Eisenga's serious underlying health concerns – which constitute co-morbidities for

COVID-19 – constitute extraordinary and compelling reasons for sentence reduction. Eisenga is

currently in BOP custody at USP Thomson satellite camp, Thomson, Illinois.

2.       As of February 13, 2022, USP Thomson had at least 86 positive inmate cases and

one staff cases Eisenga's weakened and compromised medical problems place him in at

heightened risk for serious illness or death from COVID-19. The conditions of confinement at

BOP facilities are failing to properly provide him with appropriate medical care and also greatly

increase his risk of death or serious bodily injury from complications of the virus. Eisenga thus

can show "extraordinary and compelling" reasons justifying a reduction in sentence.

3.      In this *Motion,* Eisenga asks that the Court reduce his 42-month sentence by about 29 months, to time served, to place Eisenga on an expanded term of supervised release equal to the amount of sentence being abrogated, and to order Eisenga to serve the expanded portion of that expanded term on home confinement. Such a sentence modification would not be inconsistent with the sentencing factors of 18 U.S.C. § 3553(a).

4.      Eisenga was sentenced to a 42-month sentence after being convicted of one count of bank fraud in violation of 18 U.S.C. §1343. His current release date is August 23, 2024, about 29 months from now. With the six months' home confinement provided to a low-security inmate with a minimum recidivism score under 18 U.S.C. § 3624(c)(2), Eisenga would ordinarily be sent to home confinement about on February 23, 2024, about 23 months from now. Additionally, he is eligible under 18 U.S.C. § 3632(d)(4) for federal time credits (FTCs) awarded under 18 U.S.C. § 3632(d). Pursuant to the credits Eisenga would be entitled to about 12 additional months off his sentence. This means that he effectively has 11 months until release to home confinement.

5.      Eisenga is being held at USP Thomson satellite camp, a minimum-security facility in Illinois. He has previously asked the warden to recommend to the Director of the Federal Bureau of Prisons that a motion be filed on his behalf seeking a sentence reduction under 18 U.S.C. § 3582(c)(1)(A). The warden denied his request on November 22, 2021. *See* **Exhibit 1.**

6.      Eisenga suffers from a likely immunosuppressive disease, obstructive sleep apnea, asthma, hypertension, Type 2 diabetes mellitus, and a body mass index of 33.7. These are all co-morbidities making him more likely to catch COVID-19 and, if he does, to suffer more severely from it.

7.      The COVID-19 pandemic has already killed over 950,000 people in the United States since April 2020. On January 24, 2022, the nation reported over 1.2 million new cases in

2

one day.[1] A congregate prison environment such as USP Thomson camp – with open dorms in which 850 people live in only feet from each other – is inherently unsuited to protecting against the COVID-19 virus. The virus is particularly insidious because of its invisible transmission by infected people who do not feel or show any ill effect. Notwithstanding the precautions taken by the BOP to reduce the likelihood of an outbreak at its facilities, the fact remains that prisons are like tinderboxes where a virus may spread rapidly once a single person is infected. *United States v. Gonzalez*, Case No. 3:17-cr-00062, (D.Conn. May 15, 2020) 2020 U.S. Dist. LEXIS 85762, at *6.

8.     USP Thomson experienced a major COVID-19 infection among inmates and staff in late 2020 and in March 2020. It is now experiencing another one.[2] As of February 14, 2022, over 86 inmates had current COVID-19 cases.  BOP, *COVID-19 webpage, supra.*[3] But the BOP has reported that at 41 of its 122 institutions, it has vaccinated over 3,900 more inmates than those institutions are holding.  As an illustration, the BOP reports that 1,206 FCI La Tuna (Texas) inmates have been vaccinated, while at the same time reporting a total La Tuna population of 996 inmates,[4] Claiming a 121% vaccination rate only suggests that none of the BOP's self-serving vaccination reports can be relied upon.

---

[1]     Coronavirus Resource Center, Johns Hopkins University and Medicine (February 14, 2022), found at https://coronavirus.jhu.edu/data/cumulative-cases (last accessed February 14, 2022).

[2]     BOP, *COVID-19 webpage*, found at https://www.bop.gov/coronavirus/ (last accessed February 14, 2022). *See also* Dept. of Justice Office of Inspector General, *Interactive Dashboard Relating to COVID-19 within the Federal Bureau of Prisons* (February 14, 2022), found at https://experience.arcgis.com/experience/ab22fb4c564e4f4b986e257c685190e8/page/Facility-Case-Trends/ (last accessed February 13, 2022).

[3]     BOP, *COVID-19 webpage, supra.*

[4]     BOP, *Facility Populations*, found at https://www.bop.gov/about/statistics/population_statistics.jsp (last accessed February 14, 2022).

9.      As of February 14, 2022, the BOP has had over 54,000 federal inmates and over

10,700 staff personnel test positives for COVID-19, with 2,385 inmates with active cases.[5] As of

February 14, 2022, COVID-19 was present in every one of BOP's 128 institutions (100%). Over

300 federal inmates have died in BOP and private federal prisoner facilities.[6]

10.     Staff COVID-19 case numbers at BOP institutions have remained consistently

high. The number of active COVID-19 BOP staff cases has been climbing since a June 24, 2020,

low of 133. As of February 14, 2022, the number stood at 1,892.[7] The staff is the only cohort that

enters a prison facility daily from the community and returns to the community at the end of its

shift, making it the primary vector for the disease.[8] The BOP maintains that it is prohibited from

testing staff at the prison, but BOP union officials deny this, saying the agency has ignored their

requests for such tests.[9] The BOP reports that 105 of USP Thomson's staff of at least 375 have

---

[5]      Federal Bureau of Prisons, *COVID-19 cases, supra.*

[6]      *Id.*

[7]      *Id.*

[8]      *See, e.g.,* Luna Reyna, *Seatac Federal Detention Center Exposed Prisoners to the Coronavirus by Allegedly Failing to Follow Coronavirus Protocols* (SOUTH SEATTLE EMERALD, Sept. 7, 2020), found at https://southseattleemerald.com/2020/09/07/seatac-federal-detention-center-fails-to-follow-coronavirus-protocols-exposing-prisoners-to-the-virus/ (last accessed February 14, 2022).

[9]      At a hearing of the House Subcommittee on Crime, Terrorism and Homeland Security, held December 2, 2020, BOP Director Michael Carvajal rejected Subcommittee demands for a blanket staff testing plan, telling the Subcommittee the agency could not force its employees to get tested for COVID. Jack Rodgers, *Officials Spar Over Covid Spread Through Prison System* (Courthouse News Service, Dec. 2, 2020), found at https://www.courthousenews.com/ officials-spar-over-covid-spread-through-prison-system/ (last accessed February 14, 2022).

But a written statement filed with the Subcommittee by Shane Fausey, national president of the Council of Prison Union Locals 33, AFGE, complained that the BOP "has repeatedly refused" to offer despite unions' urging voluntary coronavirus testing to the staff at the prison facility where they work. Instead, Fausey said, "employees who believe they were exposed or might be infected with the coronavirus must get tested on their own time and in their communities." Statement of Shane Fausey, Nat'l President, Council of Prison Locals (December 2, 2020), found at https://docs.house.gov/meetings/JU/JU08/20201202/111100/HHRG-116-JU08-20201202-SD003.pdf (last accessed February 14, 2022).

had COVID at least once.[10]Although President Biden ordered federal employees to get vaccinated and recently announced that over 92% of federal employees have been vaccinated,[11] 29% of BOP workers have refused to do so.[12] *Feds for Medical Freedom v. Biden*, Case No. 3:21-cv-356, (S.D. Tex. Jan. 21, 2022) 2022 U.S. Dist. LEXIS 11145, at *22. This effectively removes any incentive for BOP employees who have not gotten the vaccine to do so.

11.     Unsurprisingly, the COVID-19 mortality rate within prisons is 61.8 deaths per 100,000 inmates, twice that of the general public mortality rate, even adjusted for the sex, age, and race or ethnicity of those incarcerated. This disparity is 60% higher than a comparison using an unadjusted population mortality rate. The rate of COVID-19 cases reported by state and federal prisons is nearly 7,000 cases per 100,000 people in prison, more than four times the rate of confirmed cases per 100,000 U.S residents.[13] Average case and mortality rates within prisons conceal a great deal of heterogeneity across states.[14]

---

[10]     Federal Bureau of Prisons, *COVID-19 cases, supra* (total number of USP Thomson staff COVID cases); *see also USP Thomson PREA Report* (July 2, 2019) (number of staff), found at https://www.bop.gov/locations/institutions/tom/PREA_tom.pdf (last accessed February 11, 2022).

[11]     Eric Yoder, *More than 9 in 10 federal workers and military personnel, are vaccinated, with only a small percentage seeking exemptions, White House says* (WASHINGTON POST, November 24, 2021), found at https://www.washingtonpost.com/politics/federal-workers-vaccines/2021/11/24/54b438f6-4c88-11ec-b73b-a00d6e559a6e_story.html (last accessed February 14, 2022).

[12]     BOP, *COVID-19 webpage, supra.*

[13]     Kaley Johnson, *Man is 16th to die from COVID-19 at Fort Worth prison; cases spike at women's facility* (FT. WORTH STAR-TELEGRAM, Dec. 30, 2021), found at https://www.star-telegram.com/news/coronavirus/article256948972.html (last accessed February 14, 2022). *See also* Jessica Harkey, *Man's death marks the 17th prisoner death from COVID at Federal Medical Center Fort Worth* (FT. WORTH STAR-TELEGRAM, Jan. 27, 2022), found at https://www.star-telegram.com/news/coronavirus/article257768453.html (last accessed February 14, 2022).

[14]     Kevin Schnepel, Ph.D., *COVID-19 in State and Federal Prisons* (COUNCIL ON CRIMINAL JUSTICE, September 2, 2020) (https://www.courthousenews.com/wp-content/uploads/2020/12/ccj-covid.pdf (last accessed February 14, 2022); *see also* Emily Wang, *Decarcerating Correctional Facilities during COVID-19: Advancing Health, Equity, and Safety* (National Academies Press, November 12, 2020) (prepublication ed.), found at https://www.nap.edu/download/25945 (last accessed February 14, 2022), at p.1-1 ("[B]y August 2020 COVID-

12.   There is reason to treat the BOP's reporting of "recovered" inmates – such as the 763 "recovered" Thomson inmates it reports[15] – with some skepticism. First, the BOP has shown itself incapable of determining that inmates test negative for COVID-19. In October 2020, according to reports, the BOP accidentally introduced the coronavirus to FCI Fort Dix by transferring improperly-quarantined inmates, resulting in hundreds of inmate illnesses.[16] [17] Much of this has been due to the BOP misinterpreting CDC COVID-19 guidelines for prisons, which direct that people with confirmed or suspected COVID-19 infection be put into medical isolation "to prevent their contact with others and to reduce the risk of transmission."[18] Medical isolation is to end when the inmate meets pre-established testing criteria for release from isolation. The

---

19 cumulative cases rates among incarcerated people were nearly five times higher than the rates in the general population. In addition, the COVID-19-related death rate in the prison population was three times higher than in the U.S. population, adjusting for age and sex").

[15]   BOP, *COVID-19 webpage, supra.*

[16]   *See* Keegan Hamilton, *Federal Prisons Keep Turning Into COVID Nightmares: 'Everyone Looks Like Death'* (VICE NEWS, November 12, 2020), found at https://www.vice.com/en/article/n7vba8/federal-prisons-keep-turning-into-covid-nightmares-everyone-looks-like-death (last accessed February 14, 2022) (Brian Kokotajlo, BOP Fort Dix local union president, reportedly said six prisoners transferred from FCI Elkton on the first bus September 28 were infected with COVID-19, followed by another six on October 6, and five more on two more buses in October, and the Fort Dix outbreak followed, but a BOP spokesman admitted 17 Elkton inmates tested positive but stated that "there is no evidence that inmates from FCI Elkton increased the spread of COVID19 at FCI Fort Dix").

[17]   *Letter to BOP Director Michael Carvajal from Sen. Robert Menendez*, November 9, 2020, found at https://www.menendez.senate.gov/imo/media/doc/Senator%20Menendez%20Letter%20on%20FCI%20Fort%20Dix%20COVID19%20Outbreak%2011.9.20.pdf (last accessed February 14, 2022) (Sen. Menendez recited the transfer of COVID-positive prisoners from FCI Elkton to FCI Fort Dix, and concluded that "While the situation is rapidly evolving, it is clear that BOP does not have an effective plan to ensure COVID-19 positive inmates are not transferred between facilities"). *See also Letter to Warden David Ortiz from Sen. Robert Menendez,* February 14, 2021, found at https://www.menendez.senate.gov/imo/media/doc/1.12.21%20-%20BOP%20Letter%20to%20Fort%20Dix%20COVID-19%20Outbreak%20FINAL%20SIGNED.pdf (last accessed February 14, 2022) (demanding answers on medical care, use of personal protective equipment, and use of home confinement to curb COVID-19 cases).

[18]   *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (CDC, June 9, 2021), found at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html#prevention (last accessed February 14, 2022).

criteria include that at "least ten days have passed since symptom onset," and the inmate has no

other symptoms.[19] The BOP follows this 10-day standard, letting it write hundreds of inmates off

the "infected" list every day, ten days after they were found to have the virus.[20]

13.     At FCI Terminal Island, the BOP released an inmate whom employees knew had

tested positive for the coronavirus,[21] placing him on a commercial aircraft from Los Angeles to

his home in Anchorage, without ever informing him that he had been diagnosed with the disease.

Another Terminal Island inmate died two weeks *after* the BOP declared the man recovered from

the illness.[22] Similar cases have occurred at FMC Lexington, FMC Ft. Worth, FMC Carswell,

FCI Butner, and FCI El Reno.[23] A FCI Terre Haute inmate whom the BOP declared "recovered"

---

[19]     *Discontinuation of Isolation for Persons with COVID-19 Not in Healthcare Settings* (CDC, July 22, 2020), found at https://www.cdc.gov/coronavirus/2019-ncov/hcp/disposition-in-home-patients.html (last accessed February 14, 2022).

[20]     *BOP Settles Connecticut Inmate COVID-19 Class Action* (LEGAL INFORMATION SERVICES ASSOCIATES, August 3, 2020), found at https://www.lisa-legalinfo.com/2020/08/03/ bop-settles-connecticut-inmate-covid-class-action-update-for-august-3-2020/ (last accessed February 14, 2022). *But see Torres v. Milusnic*, Case No. CV 20-4450 (C.D. Cal. July 14, 2020), 2020 U.S. Dist. LEXIS 131446, at *22 n.37 ("It is unclear as to how the BOP determines whether an inmate is 'recovered'").

[21]     Michelle Theriault Boots, *He tested positive for the coronavirus. One day later, a federal prison flew him home to Alaska* (ANCHORAGE DAILY NEWS, May 26, 2020), at https://www.adn.com/alaska-news/crime-courts/2020/05/26/he-tested-positive-for-the-coronavirus-two-days-later-a-federal-prison-flew-him-home-to-alaska/ (last accessed February 14, 2022).

[22]     Richard Winton, *Inmate labeled as 'recovered' from coronavirus dies at Terminal Island* (LOS ANGELES TIMES, May 28, 2020), at https://www.latimes.com/california/story/2020-05-28/ninth-inmate-dies-coronavirus-terminal-island-prison (last accessed February 14, 2022).

[23]     *See also Inmate Death at FMC Lexington* (BUREAU OF PRISONS, July 31, 2020), found at https://www.bop.gov/resources/news/pdfs/20200731_press_release_lex.pdf; Sentencing Resource Counsel, *The COVID-19 Crisis in Federal Detention* (FEDERAL PUBLIC COMMUNITY DEFENDERS, Dec. 1, 2020), found at https://www.fd.org/news/new-src-fact-sheet-covid-19-crisis-federal-detention. *See also Inmate Death at FMC Fort Worth* (BUREAU OF PRISONS, July 3, 2020), found at https://www.bop.gov/resources/news/pdfs/ 20200703_press_release.pdf; *The COVID-19 Crisis in Federal Detention, supra. See* BOP, *Inmate Death at FMC Carswell* (BUREAU OF PRISONS, August 26, 2020) found at https://www.bop.gov/ resources/news/pdfs/20200826_press_release_crw.pdf. *Inmate Death at FCI Butner (Low)* (BUREAU OF PRISONS, Sept. 17, 2020), found at https://www.bop.gov/resources/news/pdfs/20200917 _press_release_bux.pdf; *Inmate Death at FCI El Reno* (BUREAU OF PRISONS, Oct. 29, 2020), found at https://www.bop.gov/resources/news/pdfs/20201029_press_release_ere.pdf. All were last accessed February 14, 2022.

last September tested positive for COVID 79 days later and died in January.[24] Another

"recovered" Terre Haute inmate died on February 7, 2021.[25] In fact, of the 56 federal inmates to

die of COVID-19 in the last 12 months – 31 of them (55%) did so *after* the BOP had declared

them to be "recovered."[26]  One inmate the BOP declared to be "recovered" on April 23, 2020 – a

---

[24]     *Inmate Death at FCI Terre Haute* (BUREAU OF PRISONS, January 21, 2021), found at
https://www.bop.gov/resources/news/pdfs/20210121_press_release_thx.pdf (last accessed February 14, 2022).

[25]     *Inmate Death at FCI Terre Haute* (BUREAU OF PRISONS, February 9, 2021), found at
https://www.bop.gov/resources/news/pdfs/20210209_press_release_thx.pdf (last accessed February 14, 2022).

[26]     *See* BOP, *Inmate Death at FMC Lexington* (Feb. 24, 2022), found at
https://www.bop.gov/resources/news/pdfs/20220225_press_release_lex.pdf; *See* BOP, *Inmate Death at USP
Tucson* (Feb. 24, 2022), found at https://www.bop.gov/resources/news/pdfs/20220225_press_release_tuc.pdf;
BOP, *Inmate Death at FMC Ft. Worth* (Jan. 27, 2022), found at
https://www.bop.gov/resources/news/pdfs/20220127_press_release_ftw.pdf; BOP, *Inmate Death at FCI Butner
Medium I* (Jan. 27, 2022), found at
https://www.bop.gov/resources/news/pdfs/20220127_press_release_bux.pdf; BOP, *Inmate Death at FCI
Loretto* (Jan. 13, 2022), found at https://www.bop.gov/resources/news/pdfs/20220113_press_release_lor.pdf;
BOP, *Inmate Death at FCI Beaumont Low* (Jan. 5, 2022), found at
https://www.bop.gov/resources/news/pdfs/20220105_press_release_bea.pdf; BOP, *Inmate Death at FMC Fort
Worth* (Dec. 16, 2021), found at https://www.bop.gov/resources/news/pdfs/20211216_press_release_ftw.pdf;
BOP, *Inmate Death at FCI Butner Medium II* (Dec. 14, 2021), found at
https://www.bop.gov/resources/news/pdfs/20211214_press_release_bux.pdf; BOP, *Inmate Death at FCI
Terminal Island* (Dec. 3, 2021), found at
https://www.bop.gov/resources/news/pdfs/20211206_press_release_trm_DSpear.pdf; BOP, *Inmate Death at
FMC Devens* (Oct. 5, 2021), found at
https://www.bop.gov/resources/news/pdfs/20211005_press_replease_dev.pdf; BOP, *Inmate Death at FCI
Beaumont Low* (Sept. 15, 2021), found at
https://www.bop.gov/resources/news/pdfs/20210915_press_release_bml.pdf; BOP, *Inmate Death at FCI
Talladega* (Sept. 9, 2021), found at https://www.bop.gov/resources/news/pdfs/20210910_press_release_tal.pdf;
BOP, *Inmate Death at FCI Butner Low* (Aug. 31, 2021), found at
https://www.bop.gov/resources/news/pdfs/20210831_press_release_bux.pdf; BOP, *Inmate Death at FCI
Beaumont Low* (Aug, 31, 2021), found at
https://www.bop.gov/resources/news/pdfs/20210831_press_release_bml_Ramirez.pdf;  BOP, *Inmate Death at
USP McCreary* (Aug, 30, 2021), found at
https://www.bop.gov/resources/news/pdfs/20210830_press_release_mcr_blanchard.pdf; BOP, *Inmate Death at
FCI Sheridan* (Aug, 18, 2021), found at
https://www.bop.gov/resources/news/pdfs/20210818_press_release_she.pdf; BOP, *Inmate Death at FCI
Seagoville* (Aug, 16, 2021), found at
https://www.bop.gov/resources/news/pdfs/20210818_press_release_sea.pdf; BOP, *Inmate Death at FMC Fort
Worth* (Aug, 3, 2021), found at https://www.bop.gov/resources/news/pdfs/20210803_press_release_ftw.pdf;
BOP, *Inmate Death at USP Victorville* (June 17, 2021), found at
https://www.bop.gov/resources/news/pdfs/20210717_vic_press_release.pdf; BOP, *Inmate Death at USP
Leavenworth* (June 2, 2021), found at
https://www.bop.gov/resources/news/pdfs/20210602_press_release_lvn.pdf; BOP, *Inmate Death at FCI
Phoenix* (May 24, 2021), found at https://www.bop.gov/resources/news/pdfs/20210525_press_release_phx.pdf;
BOP, *Inmate Death at FCI Englewood* (May 21, 2021), found at

full 17 months ago – in fact never left the hospital, finally dying in late January.[27] In light of its own experience, the BOP cannot seriously claim that a prior case of COVID protects against a more serious case later.

14.     The BOP thus holds an inmate to be "recovered" according to whether he meets a CDC standard of passage of time since diagnosis, not to whether he has recovered. Dr. Homer Venters – an epidemiologist who, among other positions, has been designated by the U.S. District Court for the Central District of California to inspect FCI Lompoc – has said, "People that tested positive, let's say 3, 4 weeks ago, may be considered recovered or not part of active cases... When you kind of wave a wand over people and say they're recovered, my experience going into jails and prisons is many of them are not actually recovered. Many of them have... very serious symptoms."[28]

---

https://www.bop.gov/resources/news/pdfs/20210521_press_release_eng.pdf; BOP, *Inmate Death at FMC Devens* (April 29, 2021), found at
https://www.bop.gov/resources/news/pdfs/20210429_press_release_dev_archambault.pdf; BOP, *Inmate Death at USP Tucson* (April 20, 2021), found at
https://www.bop.gov/resources/news/pdfs/20210420_press_release_tuc.pdf; BOP, *Inmate Death at FCI Sheridan* (April 19, 2021) , found at
https://www.bop.gov/resources/news/pdfs/20210419_press_release_she.pdf; BOP, *Inmate Death at MFCP Springfield* (April 7, 2021), found at
https://www.bop.gov/resources/news/pdfs/20210407_press_release_spg.pdf; and BOP, *Inmate Death at FCI Fort Dix* (Mar. 29, 2021), found at
https://www.bop.gov/resources/news/pdfs/20210329_press_release_ftd_trujillo.pdf. All of these were last accessed February 14, 2022.

[27]     *Inmate Death at USP Atlanta* (BUREAU OF PRISONS, Jan. 21, 2021), found at
https://www.bop.gov/resources/news/pdfs/20210123_press_release_atl.pdf (last accessed February 14, 2022).

[28]     Maria Guerrero, *Seagoville Federal Prison COVID-Cases Fall Drastically, Expert Warns Against New Data as Family Mourns Loss* (KXAS-TV, August 14, 2020), found at
https://www.nbcdfw.com/news/local/seagoville-federal-prison-covid-cases-fall-drastically-expert-warns-against-new-data-as-family-mourns-loss/2426269/ (last accessed February 14, 2022).
    Dr. Venters said in an interview reported on Nov. 6 that "All these detention settings have 'sick call' and that's the primary way for people to report COVID symptoms and get care. But when you talk to incarcerated people, they routinely tell you that their sick call requests go unanswered, or they have to submit multiple sick call requests just to get a response, or they may get a response that says, 'Here's some Tylenol,' but it isn't really an assessment or care for COVID. In some cases, those sick call requests get thrown out... It's a system that's broken." Kelly Davis, *Coronavirus in Jails and Prisons* (THE APPEAL, Nov. 6, 2020), found at
https://theappeal.org/coronavirus-in-jails-and-prisons-76/ (last accessed February 14, 2022).

15.     In *United States v. Rodriguez-Francisco*, Case No. 13 CR 233-1 (S.D.N.Y. Feb. 1, 2021), 2021 U.S. Dist. LEXIS 18813, the court relied on a CDC website that stated "[c]ases of reinfection with COVID-19 have been reported, but remain rare." That same website, updated on August 6, 2021, admits that "[b]ased on what we know from similar viruses, some reinfections are expected. We are still learning more about COVID-19. Ongoing COVID-19 studies will help us understand [h]ow likely is reinfection, [h]ow often reinfection occurs, [and h]ow soon after the first infection can reinfection take place." [29] The BOP's website, which admits that in the last nine months, 25 out of 45 inmate deaths were of persons who had once had the disease but recovered (according to the CDC's own metric), permits one of two conclusions: either the BOP is entirely wrong in how it classifies inmates as recovered from COVID, or no weight can be accorded *Rodriguez-Francisco*'s thinly-supported factual conclusion that having once contracted COVID-19 asymptomatically makes it more likely that the individual will not contract it again, or that – if he does – the second bout of the disease will be as mild as the first.

16.     This is hardly a surprise. Even the COVID-19 delta variant behaved differently than the prior rounds of COVID: after months of assurances that vaccinations substantially reduce the chances of contracting COVID-19, a CDC study released September 24 admitted that

> in July 2021, 74% (172 of 233) of inmates in a Texas federal jail
> penitentiary tested positive for the Delta variant. Prisons have experienced
> the unmitigated spread of COVID-19 since the beginning of the pandemic,
> but now the incarcerated population is largely vaccinated. At this Texas
> prison, 79% of inmates and 37% of staff members were fully vaccinated at
> the time of the Delta outbreak.[30]

---

[29]     CDC, *Reinfection* (August 6, 2021), found at https://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html (last accessed February 14, 2022).

[30]     Nina Cosdon, *Delta Variant Spreads Rapidly through Vaccinated and Unvaccinated US Prison Population* (CONTAGION, September 24, 2021), found at https://www.contagionlive.com/view/covid-19-breakthrough-infections-how-we-got-here (last accessed February 14, 2022).

17.     The study showed that COVID-19 delta infected 93% of unvaccinated inmates (39

of 42) but infected 70% (129 of 185) vaccinated inmates. Four persons were hospitalized, three of

whom were unvaccinated, and one person died who was unvaccinated. "The median interval," the

study reported, "between symptom onset and last positive reverse transcription–polymerase chain

reaction (RT-PCR) test result in fully vaccinated versus unvaccinated persons was similar..."[31]

18.     The delta variant was a tortoise next to the COVID-19 omicron variant. Omicron –

identified in South Africa for the first time on November 24, 2021,[32] – constituted 8.0% of cases

the week ending December 11, 2021; 37.9% of cases the week ending December 18, 2021, and

constituted 98.3% of cases in the United States as of January 8, 2022.[33]  On December 21, Dr.

Anthony Fauci estimated that omicron would infect over 140 million people in the U.S between

December and March 2022.

19.     Vaccines do not provide heightened resistance to omicron. The Centers for Disease

Control and Prevention, which has long represented that vaccines provide robust protection

against COVID, now admits that "we don't yet know . . . how well available vaccines and

medications work against it."[34] In fact, data suggest the opposite. One study found that after 30

[31]     Liesl M. Hagan, MPH, *et al., Outbreak of SARS-CoV-2 B.1.617.2 (Delta) Variant Infections Among Incarcerated Persons in a Federal Prison — Texas, July–August 2021* (CDC, September 24, 2021), found at https://www.cdc.gov/mmwr/volumes/70/wr/mm7038e3.htm (last accessed February 14, 2022).

[32]     Lynsey Chutel, *South Africa detects a new variant, prompting new international travel restrictions* (NEW YORK TIMES, Nov. 25, 2021), found at https://www.nytimes.com/2021/11/25/world/variant-south-africa-covid.html?searchResultPosition=83 (last accessed February 14, 2022).

[33]     *Variant Proportions* (CDC, January 8, 2022), found at https://covid.cdc.gov/covid-data-tracker/#variant-proportions (last accessed February 14, 2022).

[34]     *Omicron Variant: What You Need to Know* (CDC, Dec. 20, 2021), found at https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last accessed February 14, 2022). On January 21, 2022, the CDC said that for COVID-19 Delta, "vaccine effectiveness against hospitalization from Covid-19 was 90% from two weeks until about 6 months after dose two, 81% from at least six months after dose two and 94% at least two weeks after a booster dose. When Omicron was dominant, vaccine effectiveness against hospitalization for the same periods were 81%, 57% and 90%, respectively." Felicia Schwartz, *Third Dose of Pfizer, Moderna Covid-19 Vaccines Offers Strong Protection Against Omicron* (Wall

days the Moderna and Pfizer vaccines no longer had any statistically significant positive effect against Omicron infection, and after 90 days, their effect went negative — that is, vaccinated people were *more* susceptible to Omicron infection.[35] Confirming this negative efficacy finding, data from Denmark and the Canadian province of Ontario indicate that vaccinated people have *higher* rates of Omicron infection than unvaccinated people.

20.     An Oxford University study has found that two doses of Oxford-AstraZenica or Pfizer-BioNTech Covid-19 vaccines are substantially less effective at warding off omicron compared to previous variants of the coronavirus, scientists have found. The study tested blood samples of people 28 days after their second dose of either vaccine. When omicron was introduced to those samples, scientists reported "a substantial fall" in the neutralizing antibodies that fight off COVID compared to the immune responses seen against earlier variants. The research paper noted that some vaccine recipients "failed to neutralize [the virus] at all."[36] And the Johnson & Johnson/Janssen "vaccine produced virtually no antibody protection against the omicron coronavirus variant in a laboratory experiment, underlining the new strain's ability to get around one pillar of the body's defenses," according to Penny Moore, a virology professor at the University of The Witwatersrand, Johannesburg, South Africa.[37]

---

Street Journal, Jan. 21, 2022), found at https://www.wsj.com/articles/omicron-wave-eases-in-parts-of-u-s-france-sets-plan-to-relax-curbs-11642770561 (last accessed February 14, 2022).

[35]     Christian Holm Hansen, *et al., Vaccine effectiveness against SARS-CoV-2 infection with the Omicron or Delta variants following a two-dose or booster BNT162b2 or mRNA-1273 vaccination series: A Danish cohort study* (STATEN SERUM INSTITUTE, Dec. 23, 2021), found at https://www.medrxiv.org/content/10.1101/2021.12.20.21267966v3.full (last accessed January 26, 2022)

[36]     Wanwisa Dejnirattisai, *et al., Reduced neutralisation of SARS-COV-2 Omicron-B.1.1.529 variant by post-immunisation serum* (OXFORD UNIVERSITY, not yet peer-reviewed, Dec. 13, 2021), found at https://www.medrxiv.org/content/10.1101/2021.12.10.21267534v1 (last accessed February 14, 2022).

[37]     Anthony Sguazzin, *J&J Shot Loses Antibody Protection Against Omicron in Study* (BLOOMBERG QUINT, December 14, 2021), found at https://www.bloombergquint.com/business/j-j-shot-shows-no-neutralization-against-omicron-in-lab-study (last accessed February 11, 2022).

21.     Preliminary breakthrough data from Minnesota shows that in the age group (18-49), the vaccinated were about 50% less likely to get the disease than the unvaccinated.[38] A booster appears to provide substantial protection for four months through a mechanism known as "affinity maturation," but there is no evidence that protection lasts beyond that time. [39]A World Health Organization technical body admitted on January 11, 2022, that "current COVID-19 vaccines may need to be reworked to ensure they are effective against Omicron and future variants of the coronavirus."[40]

22.     While there has been some speculation that omicron may not generally cause symptoms as serious as those caused by alpha and delta variants, current evidence suggests that this is not the case. *See* Figure 1. The omicron epidemic is not expected to subside until March 2022, by which time modelers believe from 50,000 to 300,000 more people in the U.S. will die of the disease.[41]

---

[38]     *COVID-19 Vaccine Breakthrough Weekly Update* (MINNESOTA DEPT. OF HEALTH, Dec. 27, 2021), found at https://www.health.state.mn.us/diseases/coronavirus/stats/vbt.html (last accessed February 14, 2022).

[39]     Carolyn Johnson, *Lab study shows omicron-blocking antibodies persist four months after a Pfizer-BioNTech booster* (Washington Post, Jan. 24, 2022), found at https://www.washingtonpost.com/health/2022/01/24/do-vaccine-boosters-work-against-omicron/ (last accessed February 14, 2022).

[40]     Mrinalika Roy and Emma Farge, *WHO body says COVID-19 vaccines may need to be updated for Omicron* (REUTERS, Jan. 12, 2022), found at https://www.reuters.com/business/healthcare-pharmaceuticals/who-says-more-research-needed-vaccine-efficacy-against-omicron-2022-01-11/ (last accessed February 14, 2022).

[41]     Carla Johnson, *US faces wave of omicron deaths in coming weeks, models say* (Associated Press, Jan. 18, 2022), found at https://apnews.com/article/coronavirus-pandemic-omicron-covid-19-deaths-08f8db29985b992d5ef98ccfa1459eb7 (last accessed February 14, 2022).



**Figure 1: Omicron's death rate in the United States is surpassing prior coronavirus variants, belying earlier predictions that it was milder.**

23.    These findings should be sobering. COVID-19 delta was an equal opportunity virus, with a majority of even those who are vaccinated contracting the virus. COVID-19 omicron has an even greater ability than other strains of the virus to escape immune protection from antibodies produced by previous COVID-19 infections.[42] The BOP's real-life misadventures with 28 of 53 inmate deaths (53%) in the past 11 months being people who had previously recovered from the virus, but yet dying of COVID-19 delta, and 70% of vaccinated people in FCI Texarkana -- the facility in the CDC study – contracting the same variant does not bode well. The CDC is right: "[p]risons have experienced unmitigated spread of COVID-19 since the beginning of the pandemic." CDC's speculation months ago that prior COVID infection provided natural immunity and its rosy promises that vaccination protects against infection have been disproven –

---

[42]    Li Zhang, *et al.*, *The significant immune escape of pseudotyped SARS-CoV-2 Variant Omicron* (EMERGING MICROBES AND INFECTION, February 14, 2022), found at https://pubmed.ncbi.nlm.nih.gov/34890524/ (last accessed February 14, 2022).

or at least thrown into substantial doubt – by the BOP's real-world experience, the CDC's own

study, and a new virulent variant that is rewriting the playbook.[43]

24.     Even without the omicron variant, COVID's resistance to vaccination and natural

immunity from a prior infection is not surprising. Evidence has been mounting for the past year

that even having had COVID-19 once does not confer any medium- or long-term immunity.[44]

This suggests that those inmates who have suffered from COVID-19 may in a matter of a few

months be susceptible to the disease again.[45] Some researchers have tracked the lingering

presence of antibodies months after infection as an indicator of immunity, but a recent study

---

[43]     *See, e.g., United States v. Brunetti* (S.D.N.Y. Jan. 10, 2022), 2022 U.S. Dist. LEXIS 4604, at
*11-13: "The Court disagrees with the Government's assertion that Brunetti's vaccination status, considered in
isolation, "substantially weak[ens]" his claim that his medical conditions constitute extraordinary and
compelling reasons warranting his release. (ECF No. 323.) Although the COVID-19 vaccines remain effective
at preventing severe illness, they provide comparatively little protection against Omicron infection. *See* Ctrs. for
Disease Control and Prevention, *Update on Omicron Variant*, December 16, 2021,
https://www.cdc.gov/vaccines/acip/meetings/downloads/slides-2021-12-16/06-COVID-Scobie-508.pdf (last
visited Jan. 10, 2022) (noting that the Pfizer-BioNTech vaccine is only 33% effective at preventing Omicron
infection). The variant's ability to evade vaccine-related immunity has resulted in an exponential increase in
'breakthrough' infections in vaccinated individuals. *See* Ctrs. for Disease Control and Prevention, *Potential
Rapid Increase of Omicron Variant Infections in the United States*, https://www.cdc.gov/coronavirus/2019-
ncov/science/forecasting/mathematical-modeling-outbreak.html (last visited Jan. 10, 2022). In the state of
Florida, where FCI Coleman is located, COVID-19 cases increased by 566 percent between December 21,
2021, and January 4, 2022. *See* N.Y. Times, *Coronavirus in the U.S.: Latest Map and Case Count* (last visited
Jan. 4, 2022), https://www.nytimes.com/interactive/2021/us/covid-cases.html. As of the date of this Order, FCI
Coleman reports four active cases of COVID-19 among inmates and seven among staff. See COVID-19 Cases,
Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited Jan. 10, 2022). These numbers will
undoubtedly increase as the Omicron surge continues. *See United States v. Johnson*, No. 98 Cr. 860(7) (ARR),
2021 U.S. Dist. LEXIS 231925, 2021 WL 5755047, at *4 (E.D.N.Y. Dec. 3, 2021) (noting '[t]he risk of
breakthrough infection is greater among incarcerated individuals than members of the general public')."

[44]     Andrew G Letizia, Ph.D., *et al., SARS-CoV-2 seropositivity and subsequent infection risk in
healthy young adults: a prospective cohort study* (LANCET, April 15, 2021) found at
https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(21)00158-2/fulltext (last accessed February
14, 2022); Davide F. Robbiani, *Convergent antibody responses to SARS-CoV-2 in convalescent individuals*
(NATURE, June 18, 2020). Found at https://www.nature.com/articles/s41586-020-2456-9 (last accessed
February 14, 2022).

[45]     Angie Jackson, *State reviewing possible COVID-19 reinfections after 115 prisoners test
positive twice* (DETROIT FREE PRESS, Dec. 12, 2020, found at
https://www.freep.com/story/news/local/michigan/2020/12/12/covid-coronavirus-reinfection-michigan-
prisoners/3876185001/ (last accessed February 14, 2022).) (" Department of Corrections says its staff has
identified 115 prisoners — 114 men and one woman — who were diagnosed with COVID-19 once and tested
positive again after 90 days or longer)

shows that antibody presence is not indicative of immunity.[46]  Certainly, the BOP's list of

"recovered" inmates who subsequently died of COVID suggests that – unless the BOP erred in

believing them to be cured – it is not only possible to contract COVID-19 twice, but a victim may

well experience it more severely the second time.

25.     At least one state correctional system reported early on (in December 2020) that

inmates who have suffered from COVID-19 may in a matter of a few months be susceptible to the

disease again.[47]  Unsupported suppositions, even those of scientists, cannot substitute for facts,

and the principal fact – as discovered by the BOP and other prison systems – is that COVID-19

reinfection is not rare at all. Likewise, it now appears that vaccines are not nearly as long-lived as

first believed. Even last June, scientists were claiming that the vaccines induced a "persistent

germinal centre B cell response, which enables the generation of robust humoral immunity."[48]

But now, only a few months later, new studies showed "a substantial waning of antibody

responses and T cell immunity to SARS-CoV-2 and its variants, at 6 months following the second

immunization with the BNT162b2 vaccine. Notably, a significant proportion of vaccinees have

neutralizing titers below the detection limit, and suggest a 3rd booster immunization might be

warranted to enhance the antibody titers and T cell responses."[49]  That is, "six months after

---

[46]     Yannic Bartsch, *et al.*, *Discrete SARS-CoV-2 antibody titers track with functional humoral stability* (NATURE COMMUNICATIONS, February 15, 2021), found at https://www.nature.com/articles/s41467-021-21336-8 (last accessed February 14, 2022).

[47]     Angie Jackson, *State reviewing possible COVID-19 reinfections after 115 prisoners test positive twice* (DETROIT FREE PRESS, Dec. 12, 2020, found at https://www.freep.com/story/news/local/michigan/2020/12/12/covid-coronavirus-reinfection-michigan-prisoners/3876185001/ (last accessed February 14, 2022) ("Department of Corrections says its staff has identified 115 prisoners — 114 men and one woman — who were diagnosed with COVID-19 once and tested positive again after 90 days or longer).

[48]     Jackson S. Turner and Jane A. O'Halloran, *et al.*, *SARS-CoV-2 mRNA vaccines induce persistent human germinal centre responses* (596 NATURE 109, June 28, 2021), found at https://www.nature.com/articles/s41586-021-03738-2 (last accessed February 14, 2022).

receiving the second dose of the two-shot vaccine from Pfizer/BioNTech SE, many recipients no

longer have vaccine-induced antibodies that can immediately neutralize worrisome variants of the

coronavirus," Reuters reported that the new "study shows vaccination with the Pfizer-BioNtech

vaccine induces high levels of neutralizing antibodies against the original vaccine strain, but these

levels drop by nearly 10-fold by seven months after the initial dose," according to researchers

Bali Pulendran of Stanford University and Mehul Suthar of Emory University.[50]

26.     Living in close contact with other inmates in an open-dorm setting, Eisenga shares

restrooms, sinks, and bathing facilities. Chris Beyrer, M.D., M.P.H., a professor of Epidemiology

at the Johns Hopkins Bloomberg School of Public Health,[51] stated in a declaration filed in another

proceeding (a copy of which is attached as **Exhibit 2**, p.2): [52]

> Infections that are transmitted through droplets, like influenza and SARS-nCoV-2
> virus, are particularly difficult to control in detention facilities, as 6-foot distancing
> and proper decontamination of surfaces is virtually impossible. For example,
> several deaths were reported in the US in immigration detention facilities
> associated with ARDS following influenza A, including a 16-year old male
> immigrant child who died of untreated ARDS in custody in May 2019.
>
> A number of features of these facilities can heighten risks for exposure,
> acquisition, transmission, and clinical complications of these infectious diseases.
> These include physical/mechanical risks such as overcrowding, population density
> in close confinement, insufficient ventilation, shared toilet, shower, and eating
> environments and limits on hygiene and personal protective equipment...

---

[49]     Mehul S. Suhar, *et al.*, *Durability of immune responses to the BNT162b2 mRNA vaccine*
(BIORXIV PREPRINT, September 30, 2021), found at
https://www.biorxiv.org/content/10.1101/2021.09.30.462488v1 (last accessed February 14, 2022).

[50]     Nancy Lapid, *COVID SCIENCE-Delta increases COVID-19 risks for pregnant women;
Pfizer/BioNTech vaccine antibodies gone by 7 months for many* (REUTERS, October 1, 2021), found at
https://news.trust.org/item/20211001194329-xkwip (last accessed February 14, 2022).

[51]     Professor Beyrer, who has been active in infectious diseases epidemiology since 1992, is
currently working on the COVID-19 pandemic in the United States, and its effect on vulnerable populations,
including prisoners and detainees, in the US, Africa, Asia, and Latin America.

[52]     Filed in *United States v. Lopez*, Case No. 18-CR-2846 (D.N.M.), Dkt. 54-1.

27.     Few settings are more conducive to the spread of COVID-19 than a prison, where alcohol-based sanitizer is prohibited, and hundreds of inmates live on top of each other in open living facilities. Even prison toilets spread the virus, present in stool, by generating a virulent bioaerosol every time they are flushed.[53] Gregg Gonsalves, a professor at the Yale School of Public Health, warns, "It's really a perfect storm of problems for the COVID outbreak and prisons in the U.S. And so what everybody is saying now is, try to make it more hygienic but you've got to lower the prison population. If you have elderly prisoners who are nonviolent offenders, let them leave the prison because it's more dangerous for them inside..." *Id.* Former Attorney General Barr has warned that early release was necessary to avoid turning prisons into "petri dishes."[54]

28.     Social distancing is the best way to reduce COVID-19's spread.[55] "Practicing social distancing requires individuals to stay at least 6 feet from other people, to avoid gathering in large groups, and to stay out of crowded places and avoid mass gatherings. These measures are virtually impossible to observe in a prison setting..." *Martinez-Brooks v. Easter*, Case No. 20 Civ. 569 (D. Conn. May 12, 2020), 2020 U.S. Dist. LEXIS 83300, at *12-13. BOP Director

---

[53]     Song Tang, *Aerosol transmission of SARS-CoV-2? Evidence, prevention and control* (144 ENVIRONMENT INTERNATIONAL 106039, Nov. 2020), found at https://www.sciencedirect.com/science/article/pii/ S0160412020319942?via%3Dihub (last accessed Feb. 4, 2021). *See also* Joe Allen, *It's time to talk about how toilets may be spreading Covid-19* (WASHINGTON POST, Sept. 1, 2020), found at https://www.washingtonpost.com/opinions/2020/09/01/its-time-talk-about-how-toilets-may-be-spreading-covid-19/ (both last accessed February 14, 2022).

[54]     Sadie Gurman, *Barr Tells Federal Prisons to Increase Use of Home Confinement, Fearing Spread of Coronavirus* (WALL STREET JOURNAL, Mar. 26, 2020). At https://www.wsj.com/articles/barr-tells-federal-prisons-to-increase-use-of-home-confinement-fearing-spread-of-coronavirus-11585258295 (last accessed February 14, 2022).

[55]     CDC, *Social Distancing* (November 29, 2021), found at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (last accessed February 14, 2022). *See also* Wang, *Decarcerating Correctional Facilities during COVID-19, supra* at p. 2-6.

Michael Carvajal has said "[p]risons by design are not made for social distancing. They are…
made to contain people in one area. These are open dorm style, barrack style… facilities."[56]

29.     The BOP contends it has adopted extraordinary efforts to control the spread of
COVID-19 in its facilities. The agency has described its "phases" and quarantines and the hygiene
required of its inmate orderlies,[57] and asserts it began planning for the pandemic a year ago, and
that soap, disinfectant and personal protective equipment are all available throughout the
facilities.[58] *Martinez-Brooks, supra* at 2020 U.S.Dist. LEXIS 83300, *24-26. The BOP avers it is
responding to inmates with alacrity and compassion. *Id.* at *28-29. These blandishments are
reassuring to no one. Less than a month ago, BOP employees publicly denounced the agency's
response at FCI Englewood (Colorado).[59] "The whole pandemic response plan has failed; it just
hasn't been enforced," said Chris Janssen, the vice president of the local American Federation of
Government Employees union representing the Englewood facility's staff. "We're just seeing a
second round of COVID coming through the prison." *Id.* At FCI Danbury, a Congressional
delegation was denied entrance to inspect employees' complaints that the agency ignored COVID

---

[56]     Testimony of Michael Carvajal before the Senate Judiciary Committee, June 2, 2020, found at
https://www.rev.com/blog/transcripts/senate-judiciary-hearing-transcript-on-incarceration-during-covid-19 at
Minute 47:00 (last accessed February 14, 2022).

[57]     As Chief Judge Cole observed, "The BOP casts its overall response to COVID-19 as a
'multiphase action plan'… That phrase sounds good on paper; it conveys the message that the BOP is doing all
that it possibly can to address the outbreak at Elkton. But it means little until we look behind the curtain and
examine whether the plan's phases move the BOP closer to keeping the inmates safe. Such an examination here
reveals that the BOP's six-phase plan to address COVID-19 is far less impressive than its title suggests." *Wilson
v. Williams*, 961 F.3d 829, 848 (6th Cir. 2020) (Cole, C.J., dissenting).

[58]     *Statement of Michael D. Carvajal, Dir., Federal Bureau of Prisons, Before Committee on the
Judiciary Subcommittee on Crime, Terrorism, and Homeland Security, U.S. House of Rep.* (Dec. 2, 2020),
found at https://www.bop.gov/resources/news/pdfs/hhrg_wstate_carvajal_20201202.pdf (last accessed February
14, 2022).

[59]     Seth Klamann, *Federal prison in Colo. allowing COVID to spread largely unchecked,
employees say* (CORRECTIONS 1, Jan. 30, 2022), found at
https://www.corrections1.com/colorado/articles/federal-prison-in-colo-allowing-covid-to-spread-largely-
unchecked-employees-say-uiK4axTmRJulyEzM/ (last accessed February 14, 2022).

protocols, finally being given partial access only after two U.S. Senators pressed their demands.[60]

Sen. Christopher Murphy (D-Conn.) reportedly said afterward, "There was clearly a decision

made to try to stop both of us from seeing some of the conditions at this prison… This facility,

even during COVID, should be open for inspection by policymakers.  We need to see it during

good times, but we also need to see it during bad times. And if the Bureau of Prisons has decided

that U.S. lawmakers are not going to be able to see what is really happening inside these prisons

during a crisis, that's a problem."

30.    Several senators and congressional representatives have filed legislation seeking to

"provide more transparency about the handling of COVID-19 in prisons."[61] And BOP employees

union leadership is not convinced: one such official said BOP management is "making it worse."

According to Joe Rojas, regional vice president of the American Federation of Government

Employees Council of Prison Locals - Southeast, "They're making the virus explode instead of

containing it."[62] Brian Kokotajlo, union president at FCI Fort Dix, said he routinely has seen staff

and senior managers flouting the rules, as well as being issued expired hand sanitizer and masks

---

[60]    David Collins, *Senators say they were denied full access to federal prison* (ASSOCIATED PRESS, Jan. 26, 2022), found at https://abcnews.go.com/US/wireStory/senators-denied-full-access-federal-prison-82491231 (last accessed January 28, 2022).

[61]    Kim Bellware, *Warren, Durbin letter to Barr slams BOP's coronavirus containment efforts* (WASHINGTON POST, October 5, 2020), found at https://www.washingtonpost.com/politics/2020/10/05/warren-durbin-bop-letter/ (last accessed February 14, 2022) ("In a pair of letters to U.S. Attorney General William P. Barr and Federal Bureau of Prisons Director Michael Carvajal, two Democratic senators suggest that the government's response to coronavirus outbreaks in federal facilities is failing, and they question the BOP's reliance on solitary confinement to isolate sick prisoners rather than granting compassionate release"); Tonya Simpson, *As coronavirus spreads through nation's jails and prisons, lawmakers demand more transparency on toll* (ABC NEWS, August 9, 2020), found at https://abcnews.go.com/Politics/coronavirus-spreads-nations-jails-prisons-lawmakers-demand-transparency/story?id=72213761 (last accessed February 14, 2020).

[62]    Keri Blakinger, *"I Begged Them To Let Me Die": How Federal Prisons Became Coronavirus Death Traps* (MARSHALL PROJECT, June 18, 2020), found at https://www.themarshallproject.org/2020/06/18/i-begged-them-to-let-me-die-how-federal-prisons-became-coronavirus-death-traps (last accessed February 14, 2022).

so old the rubber straps had dry-rotted. "They never wanted to test staff," Kokotajlo said. "This is

my opinion, but I think they were afraid to test us. If we had a whole bunch come up at one time,

they were probably concerned about how the heck they would run the institution."[63][64] The BOP's

record in addressing the COVID-19 pandemic "begs the question as to whether there is a cohesive

plan to address the COVID-19 pandemic that has infected over 10,000 federal inmates and over

1,000 correctional staff..."[65]

31.     A solid metric of the BOP's lack of good faith in combatting COVID-19 was

revealed a year ago, when – after finding the BOP had breached its July 2020 settlement promise

to release medically-vulnerable FCI Danbury inmates – the *Martinez-Brooks* court ordered

specific performance of the BOP's promises to release vulnerable inmates without delay. *Order* in

*Whitted v. Brooks,* Case No. 3:20cv569, Dkt.289 (D.Conn. Dec. 11, 2020), 2020 U.S. Dist.

---

[63]     Keegan Hamilton, *Federal Prisons Keep Turning Into COVID Nightmares: 'Everyone Looks Like Death'* (VICE NEWS, Nov. 12, 2020), found at https://www.vice.com/en/article/n7vba8/federal-prisons-keep-turning-into-covid-nightmares-everyone-looks-like-death (last accessed February 14, 2022).

[64]     FCI Miami union president Kareen Troitino said the virus spread so efficiently through federal facilities because of inconsistent protocols "that are almost always reactive rather than preventive... prisoners were only getting tested if they had a fever" — a testing threshold that hobbled the early months of the U.S. coronavirus response on the outside. "The strain of the virus we got in the facility shows no fever," Troitino said. "Most inmates complain of extreme low energy, a headache, can't get out of bed, vomiting, diarrhea." Kim Bellware, *Prisoners and guards agree about federal coronavirus response: 'We do not feel safe'* (WASHINGTON POST, August 24, 2020). Found at https://www.washingtonpost.com/nation/2020/08/24/prisoners-guards-agree-about-federal-coronavirus-response-we-do-not-feel-safe/ (last accessed February 14, 2022).

[65]     Walter Pavlo, *As Bureau of Prisons Enters "Phase 9" of COVID-19 Plan, BOP Staff Wonder If There Is A Real Plan* (FORBES, Aug. 7, 2020). Found at https://www.forbes.com/sites/walterpavlo/2020/08/07/as-bureau-of-prisons-enters-phase-9-of-covid-19-plan-bop-staff-wonder-if-there-is-a-real-plan/?sh=399eb9bf326f (last accessed February 14, 2022). In a letter to the Governor of Mississippi, Cyndee L. Price, president of the FCC Yazoo City union, complained, "[T]he inmates that have arrived to USP Yazoo City, from other agencies, have tested positive for COVID-19. From the onset of the Pandemic, FCC Yazoo City was at forty (40) percent affected with the Coronavirus. Miraculously, we were able to reduce that percentage to zero (0) until recently. By allowing these inmates to come into our facilities with this deadly virus, it not only puts the inmate population at risk, but staff as well. That is a risk that we are being forced to take due to the Agency's negligence..." *See Letter from Cyndee L. Price to Gov Tate Reeves,* Sept. 22, 2020 (found at https://www.lisa-legalinfo.com/wp-content/uploads/2020/11/fcc-yazoo-city-changed-security-level.pdf (last accessed February 14, 2022).

LEXIS 232843, *4-5. Despite this, the Director says the BOP has "a decisive and comprehensive action plan to protect the health of the inmates in our custody, the staff, and the public, to the greatest extent possible, consistent with sound medical and corrections principles."[66]

32.     This statement no longer has any credibility. Last November, Sen. Richard Durbin, chairman of the Judiciary Committee, called for Carvajal's firing, stating

> Director Carvajal… has overseen a series of mounting crises, including failing to protect BOP staff and inmates from the COVID-19 pandemic, failing to address chronic understaffing, failing to implement the landmark *First Step Act*, and more. It is past time for Attorney General Garland to replace Director Carvajal with a reform-minded Director who is not a product of the BOP bureaucracy.[67]

33.     Carvajal announced his retirement on January 5, 2022.[68] Calling his management of the agency "tumultuous," the Associated Press said his management "included the rampant spread of coronavirus inside federal prisons [and] a failed response to the pandemic."[69]An excellent illustration is this: while "the BOP's multiphase plan included consultation with experts from the CDC[, t]he CDC's own guidelines, however, provide that social distancing is a

---

[66]     *Written Statement of BOP Director Michael Carvajal before the House Subcommittee on Crime, Terrorism and Homeland Security* (December 2, 2020) at p.4, found at https://www.bop.gov/resources/news/pdfs/hhrg_wstate_carvajal_20201202.pdf (last accessed February 14, 2022).

[67]     On November 16, 2021, Sen. Durbin demanded that Carvajal be fired for – among failings – "the rampant spread of coronavirus inside prisons and a failed response to the pandemic." Associated Press, *Durbin Calls for Garland to Remove Federal Prisons Director* (Nov. 16, 2021), found at https://www.usnews.com/news/politics/articles/2021-11-16/durbin-calls-for-garland-to-remove-federal-prisons-director (last accessed February 14, 2022). He renewed his demand on the floor of the Senate two weeks later. Michael Balsalmo, *Durbin: Prisons chief has 'no intention of reforming' system* (Associated Press, December 2, 2021), found at https://kdhnews.com/news/politics/durbin-prisons-chief-has-no-intention-of-reforming-system/article_c44fb207-5daa-5702-ba0c-f01aae2772d8.html (last accessed February 14, 2022). *See also Durbin Calls on AG Garland To Dismiss BOP Director Carvajal* (Senate Judiciary Committee, Nov. 16, 2021), found at https://www.durbin.senate.gov/newsroom/press-releases/durbin-calls-on-ag-garland-to-dismiss-bop-director-carvajal (last accessed February 14, 2022).

[68]     Michael Balsalmo, US prisons director resigning after crises-filled tenure (ASSOCIATED PRESS, January 6, 2022), found at https://www.corrections1.com/coronavirus-covid-19/articles/us-prisons-director-resigning-after-crises-filled-tenure-1G7HXLNSYU7PcigB/ (last accessed February 14, 2022.

[69]     *Id.*

cornerstone of reducing transmission of respiratory disease. [Yet the] plan does not include measures for meaningful social distancing." *Torres v. Milusnic*, Case No. CV 20-4450 (C.D. Cal. July 14, 2020), 2020 U.S. Dist. LEXIS 131446, at *44. *See also Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020) ("dormitory-style housing — which places inmates within feet of each other — and the medically-vulnerable subclass's health risks, presents a substantial risk" of COVID transmission); *Martinez-Brooks, supra* at 2020 WL 2405350, at *21 ("structure of the three facilities at FCI Danbury... heightens the risk of transmission" due to impossibility of social distancing). And in *Fernandez-Rodriguez v. Licon-Vitale*, Case No. 20cv3315 (S.D.N.Y. July 2, 2020) 2020 U.S. Dist. LEXIS 116749, at *51-52, the court found that MCC New York failed to effectively manage its sick-call system, to contract-trace among its staff, to effectively isolate suspected inmate COVID-19 cases, and to effectively maintain social distancing. MCC New York "performed almost no planning for the pandemic until the day the first inmate tested positive... [and] as the outbreak progressed, MCC had difficulty operating the existing sick-call system and implementing the response plans it had created." *Id.* at 2020 U.S. Dist. LEXIS 116749, at *61-62. The facility has since been closed, "'at least temporarily' following decades of dysfunction."[70] In addition to the foregoing, the BOP has suffered a systemwide failure to effectively use its authority under § 12003(b)(2) of *The CARES Act, supra*, and 18 U.S.C. §3582(c)(1)(A) to place inmates in home confinement as a means of getting them out of the path of the pandemic. *See, e.g., Martinez-Brooks, supra* at 2020 U.S. Dist. LEXIS 83300, *70-71 (The implementation of *CARES Act* authority and compassionate release at FCI Danbury "has been slow and inflexible...").[71] While the BOP must be given the opportunity to determine whether to file a

---

[70]     Matt Stieb, *The MCC Is DOA* (NEW YORK MAGAZINE, Aug. 26, 2021), found at https://nymag.com/intelligencer/2021/08/doj-to-close-mcc-manhattan-jail-where-epstein-killed-himself.html (last accessed February 14, 2022).

motion for compassionate release on behalf of a prisoner prior to the prisoner doing so himself or herself, as of December 2, 2020, out of 10,940 requests to the BOP that it bring compassionate release motions, the agency had turned down or failed to respond to 10,929.[72] Thus, the evidence suggests that Judge Cole's dissent may be right: when "we look behind the curtain and examine whether the plan's phases move the BOP closer to keeping the inmates safe," the BOP's action plan "is far less impressive than its title suggests." *Wilson, supra* at 961 F.3d 848.

34.     Merely counting deaths misses the damage COVID-19 does to the survivors. The disease initially attacks the lungs,[73] but also other organs, including the heart and blood vessels, kidneys, gut, and brain. The list of lingering maladies resulting from COVID-19 – referred to by the National Institutes of Health as PASC, which stands for "post-acute sequelae of SARS-CoV-2"[74] – is long and varied, including fatigue, a racing heartbeat, shortness of breath, achy joints,

---

[71]     *See also Order* in *Whitted v, Brooks, supra* at 2020 U.S. Dist. LEXIS 232843, *1 (BOP and Warden have "breached the provision of the Settlement Agreement requiring that they 'endeavor to release individuals approved for home confinement to home confinement within 14 days of the approval decision'"); and *Fernandez-Rodriguez, supra* at 2020 U.S. Dist. LEXIS 116749, *51 (("[R]ather than attempt to use home confinement, furloughs, and compassionate release as tools to reduce the density among the most vulnerable inmates, the prison chose to not pursue that path at all until well after the initial outbreak had subsided"); *Torres, supra* at 2020 U.S. Dist. LEXIS 131446, *44 ("Despite... the existence of emergency conditions facing the BOP as the result of the pandemic... there is no evidence Respondents are prioritizing their use of statutory authority under the *CARES Act* to grant home confinement to Lompoc inmates... or giving due consideration to inmates' age or medical conditions in evaluating eligibility of home confinement"). *See also Order Granting Motion to Enforce Compliance with Preliminary Injunction and for Order to Show Cause, Torres, supra,* at Dkt. 105, filed October 8, 2020.

[72]     *Oversight of the Federal Bureau of Prisons and the U.S. Marshals Service,* House Subcommittee on Crime, Terrorism and Homeland Security (December 2, 2020), Minute 75:11, found at https://judiciary.house.gov/calendar/eventsingle.aspx?EventID=3451 (last accessed February 14, 2022).

[73]     Meredith Wadman, et al., *How does coronavirus kill? Clinicians trace a ferocious rampage through the body, from brain to toes* (SCIENCE, April 17, 2020), found at https://www.sciencemag.org/news/2020/04/how-does-coronavirus-kill-clinicians-trace-ferocious-rampage-through-body-brain-toes (last accessed December 4, 2021). *See also* Matthew Woodruff, *COVID-19 causes some patients' immune systems to attack their own bodies, which may contribute to severe illness* (THE CONVERSATION, October 23, 2020), found at https://theconversation.com/covid-19-causes-some-patients-immune-systems-to-attack-their-own-bodies-which-may-contribute-to-severe-illness-148509 (last accessed December 1, 2021); Apoorva Mandavilli, *Some Covid Survivors Have Antibodies That Attack the Body, not Virus* (THE NEW YORK TIMES, October 27, 2020), found at https://www.nytimes.com/2020/10/27/health/covid-antibodies-autoimmunity.html (last accessed February 14, 2022).

foggy thinking, a persistent loss of sense of smell, and damage to the heart, lungs, kidneys, and brain.[75] One study found that 87% of a cohort hospitalized for acute COVID-19 was still struggling two months later primarily from fatigue and dyspnea.[76] Two JAMA CARDIOLOGY studies suggest that in many patients, COVID-19 may presage heart failure. A growing number of cases describe a wide array of neurological manifestations, combinations of non-specific complications of systemic disease, of effects of direct viral infection, or inflammation of the nervous system and vasculature.[77] [78] National Institutes of Health scientists found from complete autopsies of 44 COVID patients that the virus was "widely distributed, even among patients who died with asymptomatic to mild COVID-19, and that virus replication is present in multiple extrapulmonary tissues early in infection. Further, we detected SARS-CoV-2 RNA in multiple anatomic sites, including regions throughout the brain, for up to 230 days following symptom onset. Despite extensive distribution of SARS-CoV-2 in the body, we

---

[74]     Tae Chung, M.D., *et al, COVID 'Long Haulers': Long-Term Effects of COVID-19* (JOHNS HOPKINS MEDICINE, Dec. 8, 2021), found at https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/covid-long-haulers-long-term-effects-of-covid19 (last accessed February 14, 2022).

[75]     Jennifer Couzin-Frankel, *From 'brain fog' to heart damage, COVID-19's lingering problems alarm scientists* (SCIENCE, July 31, 2020), found at https://www.sciencemag.org/news/2020/07/brain-fog-heart-damage-covid-19-s-lingering-problems-alarm-scientists (last accessed February 14, 2022).

[76]     Angelo Carfi, M.D., et al., *Persistent Symptoms in Patients After Acute COVID-19* (JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, July 9, 2020), found at https://jamanetwork.com/journals/jama/fullarticle/2768351 (last accessed February 14, 2022).

[77]     Elizabeth Cooney, *Covid-19 infections leave an impact on the heart, raising concerns about lasting damage* (STAT, July 27, 2020), found at https://www.statnews.com/2020/07/27/covid19-concerns-about-lasting-heart-damage/ (last accessed February 14, 2022).

[78]     Mark Ellul, *Neurological associations of COVID-19* (NEUROLOGY, July 2, 2020), found at https://doi.org/10.1016/S1474-4422(20)30221-0 (last accessed February 14, 2022). *Also* Stephani Sutherland, *What We Know So Far about How COVID Affects the Nervous System* (SCIENTIFIC AMERICAN, Oct. 22, 2020), found at https://www.scientificamerican.com/article/what-we-know-so-far-about-how-covid-affects-the-nervous-system/ (last accessed February 14, 2022).

observed a paucity of inflammation or direct viral cytopathology outside of the lungs\ SARS-CoV-2 causes systemic infection and can persist in the body for months."[79]

35.     Johns Hopkins Medicine researcher Emily Brigham, M.D., reported that SARS-CoV-2 can attack the body in a range of ways, causing damage to the lungs, heart, nervous system, kidneys, liver, and other organs. Mental health problems can arise from grief and loss, unresolved pain or fatigue, or from post-traumatic stress disorder (PTSD) after treatment in the intensive care unit (ICU). "We're seeing a spectrum of symptoms after acute COVID-19, some of which would be expected after other critical illnesses," she said. "Some are minor, but other people may need continuing care and even readmission to the hospital... But what's curious is that it seems post-COVID-19 syndrome is not just afflicting people who were very sick with the coronavirus. "Patients who were never severely ill are coming to clinic and saying that their lives are different now." *COVID 'Long Haulers': Long-Term Effects of COVID-19, supra.*

36.     The existence of the pandemic, the presence of COVID-19 at Thomson, and Eisenga's medical vulnerability to it combine to constitute exceptional and compelling reasons exist warranting a sentence reduction. *See United States v. Rodriguez*, 451 F.Supp.3d 392, 397 (E.D.Pa., 2020) (the presence of COVID-19 and underlying health conditions rendering a defendant especially vulnerable to it are extraordinary and compelling reasons "for reducing his sentence '[b]eyond what is usual, customary, regular, or common,' and reasons 'so great that irreparable harm or injustice would result if [the relief] is not [granted]'," quoting *Extraordinary*, BLACK'S LAW DICTIONARY [11th ed. 2019] and *Compelling Need, id*).[80]

---

[79]     Daniel Chertow, *et al., SARS-CoV-2 infection and persistence throughout the human body and brain* (NAT'L INSTITUTES OF HEALTH, Dec. 20, 2021), found at https://doi.org/10.21203/rs.3.rs-1139035/v1 (last accessed February 14, 2022).

37.     The existence of the pandemic, the presence of COVID-19 at Thomson, and
Eisenga's medical vulnerability to it combine to constitute exceptional and compelling reasons
exist warranting a sentence reduction. *See United States v. Rodriguez*, 451 F.Supp.3d 392, 397
(E.D.Pa., 2020) (the presence of COVID-19 and underlying health conditions rendering a
defendant especially vulnerable to it are extraordinary and compelling reasons "for reducing his
sentence '[b]eyond what is usual, customary, regular, or common,' and reasons 'so great that
irreparable harm or injustice would result if [the relief] is not [granted]'," quoting *Extraordinary*,
BLACK'S LAW DICTIONARY [11th ed. 2019] and *Compelling Need, id*).[81]

38.     Eisenga suffers from obesity, hypertension, asthma, obstructive sleep apnea, Type
II diabetes, and an immunosuppressive disease that dome physicians believe may be babesiosis
[82]or Lyme disease which others believe may be rheumatoid in origin but thus far evading

---

[80]     *See* S.312, 117th Cong., 1st Session. Introduced February 12, 2021, by Sen. Richard Durbin (D-Ill.) and Charles Grassley (R.-Iowa), the legislation – known as the *COVID-19 Safer Detention Act* – was written partly in response to the BOP's refusal to support a compassionate release request from even a single prisoner because of vulnerability to COVID-19. S.312, if passed, clarifies that vulnerability to COVID-19 – without any additional requirement – establishes eligibility standards for compassionate release. *See* Office of Richard Durbin, *Durbin, Grassley Introduce Bipartisan Legislation To Reform Elderly Home Detention And Compassionate Release Amid COVID-19 Pandemic* (February 10, 2021), found at
https://www.durbin.senate.gov/newsroom/press-releases/durbin-grasslet-introduce-bipartisan-legislation-to-reform-elderly-home-detention-and-compassionate-release-amid-covid-19-pandemic (last accessed February 14, 2022).

The Senate Judiciary Committee has reported the legislation to the full Senate by a vote of 14-8. *See https://www.congress.gov/bill/117th-congress/senate-bill/312/actions* (last accessed February 14, 2022).

[81]     *See* S.312, 117th Cong., 1st Session. Introduced February 12, 2021, by Sen. Richard Durbin (D-Ill.) and Charles Grassley (R.-Iowa), the legislation – known as the *COVID-19 Safer Detention Act* – was written partly in response to the BOP's refusal to support a compassionate release request from even a single prisoner because of vulnerability to COVID-19. S.312, if passed, clarifies that vulnerability to COVID-19 – without any additional requirement – establishes eligibility standards for compassionate release. *See* Office of Richard Durbin, *Durbin, Grassley Introduce Bipartisan Legislation To Reform Elderly Home Detention And Compassionate Release Amid COVID-19 Pandemic* (February 10, 2021), found at
https://www.durbin.senate.gov/newsroom/press-releases/durbin-grasslet-introduce-bipartisan-legislation-to-reform-elderly-home-detention-and-compassionate-release-amid-covid-19-pandemic (last accessed January 31, 2022).

The Senate Judiciary Committee has reported the legislation to the full Senate by a vote of 14-8. *See https://www.congress.gov/bill/117th-congress/senate-bill/312/actions* (last accessed January 31, 2022).

diagnosis. *See* **Exhibit 3**.[83] These are all vulnerabilities to COVID-19 which rises to the

"exceptional and compelling" standard of 18 U.S.C. § 3582(c)(1)(A). *See People with Certain*

*Medical Conditions, supra*:

> Overweight (defined as a body mass index (BMI) $\geq$ 25 kg/m$^2$ but < 30 kg/m$^2$), obesity (BMI $\geq$ 30 kg/m$^2$ but < 40 kg/m$^2$), or severe obesity (BMI of $\geq$ 40 kg/m$^2$), can make you more likely to get severely ill from COVID-19. The risk of severe COVID-19 illness increases sharply with elevated BMI...

> Having heart conditions such as heart failure, coronary artery disease, cardiomyopathies, and possibly high blood pressure (hypertension) can make you more likely to get severely ill from COVID-19.

> Having a chronic lung disease can make you more likely to get very sick from COVID-19. Chronic lung diseases can include... [a]sthma, if it's moderate to severe...

> Having either type 1 or type 2 diabetes can make you more likely to get very sick from COVID-19...

> Being immunocompromised can make you more likely to get very sick from COVID-19. Many conditions and treatments can cause a person to be immunocompromised or have a weakened immune system...

*See also United States v. Harris*, Case No. 10-80, (W.D. Pa. Dec. 30, 2020) 2020 U.S. Dist.

LEXIS 244371, at *5 (each of defendant's muscular dystrophy, type II diabetes, hypertension,

thalassemia, and obesity, "is a risk factor on its own..." and court concludes defendant's

muscular dystrophy constitutes an extraordinary and compelling circumstance warranting a

reduction in his sentence").

---

[82]     Babesiosis, spread by ticks, infects red blood cells. Some victims develop flu-like symptoms, such as fever, chills, sweats, headache, body aches, loss of appetite, nausea, or fatigue. Because *Babesia* parasites infect red blood cells, babesiosis can cause hemolytic anemia (from the destruction of red blood cells). Babesiosis can be a severe, life-threatening disease. *Parasites – Babesiosis* (CDC, March 31, 2020), found at https://www.cdc.gov/parasites/babesiosis/ (last visited February 15, 2022).

[83]     For obesity, *see* **Exhibit 3,** pp. 2, 12, 14, 19, 22 and 23; for obstructive sleep apnea, *see* p.2, 9, 12, 18, 20 and 23; for hypertension, *see* pp. 18, 19, 20, 22 and 23; for asthma, see p. 2, 18, 20 and 23; for Type II diabetes, see pp. 2, 7, 8, 12, 14, 17, 18, 20 and 23; and for an immunosuppressive illness, see pp. 1, 18 and 20-21, 23.

39.     Eisenga's body mass index is 33.7, and places him in the obesity category. The CDC lists obesity as a condition that increases the risk of severe illness from COVID-19. "[I]n its most recent guidance, the CDC noted that 'strong and consistent' evidence from medical studies have shown that obesity is in a category of conditions that present the greatest risk of serious illness from COVID-19… Consistent with this guidance, courts have frequently found obesity as a significant factor warranting early release." *United States v. Johnson*, Case No. 03-20013-01 (D. Kan. Oct. 9, 2020), 2020 U.S. Dist. LEXIS 187755, at *4-5, citing CDC, *Evidence Used to Update the List of Underlying Medical Conditions that Increase a Person's Risk of Severe Illness from COVID-19* and *United States v. Rivera* (E.D. Mich. Aug. 31, 2020), 2020 WL 5105090, at *3.

40.     Special note should be made of obesity. Several studies in the past several months have concluded that vaccines are less effective to an as-yet-unknown degree where the patient suffers from obesity. *See, e.g.,* Wesley Chang, Clinical manifestations of COVID-19 differ by age and obesity status (Influenza and Other Respiratory Viruses, October 19, 2021),[84] Kipshidze, Kipshidze, & Fried, *COVID-19 Vaccines: Special Considerations for the Obese Population* (OBESITY SURGERY, Apr. 8, 2021);[85] Watanabe, M, *et al., Central obesity, smoking habit and hypertension are associated with a blunted serological response to COVID-19 mRNA vaccine* (DIABETES/METABOLISM RESEARCH AND REVIEWS, April 15, 2021);[86] and Pellini, R., *et al., Obesity may hamper SARS-CoV-2 vaccine immunogenicity* (UNIVERSITY OF WASHINGTON, Feb.

---

[84]   Found at https://doi.org/10.1111/irv.12918 (last accessed January 12, 2022).

[85]   Found at https://doi.org/10.1007/s11695-021-05404-y (last accessed January 12, 2022).

[86]   Found at https://www.medrxiv.org/content/10.1101/2021.04.13.21255402v1 (last accessed January 12, 2022).

26, 2021).[87] All of these studies suggest that vaccine effectiveness is compromised by the condition of obesity, meaning that even if the omicron variant were not already ravaging the fiction that vaccines protect people against COVID (*see* Li Zhang, *et al., The significant immune escape of pseudotyped SARS-CoV-2 Variant Omicron*; Christian Holm Hansen, *et al., Vaccine effectiveness against SARS-CoV-2 infection with the Omicron or Delta variants following a two-dose or booster BNT162b2 or mRNA-1273 vaccination series: A Danish cohort study, supra;* and Wanwisa Dejnirattisai, *et al., Reduced neutralisation of SARS-COV-2 Omicron-B.1.1.529 variant by post-immunisation serum, supra.* Thus, the vaccine Eisenga received may already be less effective than the clinical numbers predict for a person not suffering from obesity.

41.    Eisenga also suffers from hypertension. Hypertension has been linked to an increased susceptibility to COVID-19.[88] Courts have recognized that other studies have found hypertension independently increases the risk of serious illness from COVID-19. *See United States v. Salvagno*, Case No. 5:02-CR-5 (N.D.N.Y. June 22, 2020), 2020 U.S. Dist. LEXIS 109879, at \*61-63, citing *United States v. DeBartolo*, Case No. 14-016 (D.R.I. June 10, 2020), 2020 U.S. Dist. LEXIS 102335, at \*3 (noting that "at least one recent study suggests hypertension increases the relative risk of mortality two-fold for a patient hospitalized with COVID-19, as compared with those without hypertension*"). See also United States v. Highsmith*, Case No. 7:15-CR-71-BR, (E.D.N.C. Jan. 20, 2022) 2022 U.S. Dist. LEXIS 10786, at \*6 (defendant showed extraordinary and compelling reasons for sentence reduction where he suffered from

---

[87]    Found at https://depts.washington.edu/pandemicalliance/2021/02/26/obesity-may-hamper-sars-cov-2-vaccine-immunogenicity/ (last accessed January 12, 2022).

[88]    Li Fang, *et al., Are patients with hypertension and diabetes mellitus at increased risk for COVID-19 infection?* (THE LANCET, Mar. 11, 2020). Found at https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30116-8/fulltext (last accessed January 12, 2022).

being overweight and having hypertension: "According to the CDC, being overweight and possibly having hypertension can make one more likely to get severely ill from COVID-19," citing CDC, *People with Certain Medical Conditions, supra*); *United States v. Sawicz*, 453 F. Supp. 3d 601, 605 (E.D.N.Y. 2020) (defendant, sentenced to five years for violating supervised release by possessing child pornography, was granted compassionate release due to hypertension).

42.    Eislenga suffers from diabetes. Diabetes is a condition that significantly increases the risks he faces from COVID. Overall, people with diabetes have a higher risk of developing different infectious diseases and demonstrate increased mortality. Type 2 diabetes mellitus (T2DM) is a significant risk factor for COVID-19 progression and its severity, poor prognosis, and increased mortality.[89] Diabetes has been recognized as a substantial risk factor that rises to an extraordinary and compelling reason for sentence reduction in the face of the COVID-19 pandemic. *United States v. Amarrah*, 458 F. Supp. 3d 611, 618 (E.D. Mich. 2020) (compassionate release granted where defendant suffered from type II diabetes, hypertensive heart disease, cardiac arrhythmia, obstructive sleep apnea and asthma); *United States v. Doshi*, Case No. 13-cr-20349 (E.D. Mich. May 20, 2020), 2020 U.S. Dist. LEXIS 88539, at *7 (diabetes mellitus and hyperlipidemia constitute extraordinary and compelling reasons for sentence reduction in light of COVID-19); *United States v. Jaramillo*, Case No. 16-cr-20593 (E.D. Mich. Feb. 16, 2021), 2021 U.S. Dist. LEXIS 27963, at *3 (age and history of heart conditions, hyperlipidemia, diabetes, rheumatoid arthritis, gout and hyperthyroidism constitute extraordinary and compelling reasons).

43.    Eisenga also suffers from moderate asthma. *See* medical record, attached as **Exhibit 3**. Moderate asthma constitutes a vulnerability to COVID-19 which rises to the

---

[89]    Mahnaz Norouzi, *et al., Type-2 Diabetes as a Risk Factor for Severe COVID-19 Infection* (MICROORGANISMS, June 3, 2021), found at https://pubmed.ncbi.nlm.nih.gov/34205044/ (last accessed January 10, 2022).

"exceptional and compelling" standard of 18 U.S.C. § 3582(c)(1)(A). *See People with Certain*

*Medical Conditions, supra.*    Moderate to severe asthma is defined by the CDC according to the

severity scale established by National Asthma Education and Prevention Program (a program

within the National Heart, Lung and Blood Institute, a division of the National Institutes of

Health). *See* 42 U.S.C. § 285b-7b; *see also* National Asthma Education and Prevention Program

(NAEPP).[90] For initial diagnoses, the classifications are as follows: [91]

| Classification | Days with Symptoms | Nights with Symptoms |
|---|---|---|
| Mild intermittent | ≤2/week | <2/month |
| Mild persistent | >2/week but <1/day | >2/month |
| Moderate persistent | Daily | >1/week |
| Severe persistent | Continual | Frequent |

*United States v. Kyger*, Case No. 19-cr-77 (D. Colo. July 17, 2020), 2020 U.S. Dist. LEXIS 125787,

at *6-8.

44.    Asthma has been acknowledged by the courts to constitute an extraordinary and

compelling reason for a sentence reduction. *United States v. Amarrah*, 458 F. Supp. 3d 611, 618

(E.D. Mich. 2020) (compassionate release granted where defendant suffered from type II diabetes,

hypertensive heart disease, cardiac arrhythmia, obstructive sleep apnea and asthma). Eisenga

possesses a chronic lung morbidity that increases the risk of his contracting COVID-19 and, if he

does, suffering more severely than the average victim of the virus.

45.    The CDC risk factors also include specifically "[p]eople of all ages with underlying

medical conditions, particularly if not well controlled, including… cancer… "and any disease

---

[90]    Found at https://www.nhlbi.nih.gov/science/national-asthma-education-and-prevention-program-naepp (last visited Sept. 1, 2020).

[91]    Seymour G. Williams et al., *Key Clinical Activities for Quality Asthma Care: Recommendations of the National Asthma Education and Prevention Program*, 52 MORBIDITY AND MORTALITY WEEKLY REPORT: RECOMMENDATIONS AND REPORTS NO. RR-6, March 28, 2003 at 4 (table 2), found at https://www.cdc.gov/mmwr/PDF/rr/rr5206.pdf (last visited Nov. 29, 2020).

leading to a compromised immune system."[92] The BOP's own outside medical specialist disputes records from prior physicians that Eisenga suffers from the long-term immune response to a tickborne disease (either Lyme disease or babesiosis), but suggests instead some immunosuppressive illness. **Exhibit 3,** pp. 19-23. Any immune-compromised conditions are risk factors for COVID-19. *See United States v. Beck*, 425 F. Supp. 3d 573, 574 (M.D.N.C. 2019) (defendant's breast cancer was risk factor for COVID-19 justifying compassionate release). Many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications.[93]

46.     District courts have cited a weakened immune system as a basis for granting compassionate release. *United States v. Stephenson*, Case No. 3:05-CR-00511 (S.D. Iowa May 21, 2020), 2020 U.S. Dist. LEXIS 89591, at *14-15; *United States v. Campagna*, Case No. 16cr37-01 (S.D.N.Y. Mar. 27, 2020), 2020 U.S. Dist. LEXIS 54401, at *3 (noting the fifty-five-year-old defendant "suffers from a compromised immune system... put[ting] him at significant risk if he were to become infected with the current Coronavirus"); *United States v. Jepsen*, Case No. 3:19-cv-00073 (D. Conn. Apr. 1, 2020), 2020 U.S. Dist. LEXIS 57007, at *9 (defendant entitled to compassionate release because immunocompromised).

47.     The CDC has not identified obstructive sleep apnea ("OSA") as a morbidity for COVID-19, but new research has found otherwise. A study published in late November 2021 found

---

[92]     *COVID-19 Vaccines for Moderately or Severely Immunocompromised People* (CDC, Feb. 17, 2022) found at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html (last visited February 17, 2022).

[93]     *See* CNN, *Those with high blood pressure are at a greater risk for Covid-19. Here's what you need to know to protect yourself* (April 17, 2020). At https://www.cnn.com/2020/04/17/health/blood-pressure-coronaviruwellness/index.html (last visited August 31, 2020).

that OSA – a sleep disorder where the throat muscles relax, causing the airway to block, leading to breathing issues during sleep and strongly associated with male gender, obesity, and diabetes mellitus – is an independent risk factor for severe COVID-19: OSA is responsible for a twofold increase in the risk of severe COVID-19.[94]

48.    In *Rodriguez, supra* at 451 F.Supp.3d 402, the court granted compassionate release to an inmate whose diabetes had left him immune system compromised, noting that noting that defendant Rodriguez's health conditions alone, absent the pandemic, did not provide a basis for compassionate release. However, the court noted, "[i]t is the *confluence* of COVID-19 and Mr. Rodriguez's health conditions that makes this circumstance extraordinary and compelling" (emphasis added). Here, Eisenga is serving his sentence in pain, inasmuch as the BOP has cut off the medicines prescribed his personal physicians prior to his incarceration which enable him to function through the pain of his immunosuppressive illness. *See* **Exhibit 3**, p. 24.

49.    Eisenga suffers from six separate morbidities – obesity, asthma, hypertension, diabetes, OSA and a compromised immune system. These dramatically increase the risk that COVID-19 carries and constitute vulnerabilities to COVID-19 which rise to the "exceptional and compelling" standard of 18 U.S.C. § 3582(c)(1)(A). Comorbidities like these have been acknowledged by the courts to constitute extraordinary and compelling reasons for a sentence reduction and substantially increase the danger Eisenga faces from COVID-19, "exacerbat[ing] each other, placing him in a much more vulnerable position than a healthy person, if he were to

---

[94]    Kristján Godsk Rögnvaldsson, *et al., Obstructive sleep apnea is an independent risk factor for severe COVID-19: a population-based study* (SLEEP, Nov. 17, 2021) at p. 272, found at https://doi.org/10.1093/sleep/zsab272 (last accessed January 12, 2022). *See also* Matthew Maas, *Obstructive Sleep Apnea and Risk of COVID-19 Infection, Hospitalization and Respiratory Failure* (SLEEPING & BREATHING, Vol. 25, 1157, June 2021), found at https://pubmed.ncbi.nlm.nih.gov/32989673/ (last accessed January 31, 2022).

get COVID-19." *Howard v. United States*, Case No. 16-20222 (E.D. Mich. May 22, 2020), 2020 U.S. Dist. LEXIS 90130, at *8-9 (citing Wei-jie Guan *et al., Comorbidity and its impact on 1590 patients with COVID-19 in China: a nationwide analysis* (EUROPEAN RESPIRATORY JOURNAL, 2020) ("Among laboratory confirmed cases of COVID-19, patients with *any* comorbidity yielded poorer clinical outcomes than those without. A greater number of comorbidities also correlated with poorer clinical outcomes").[95] (Emphasis added). *See also United States v. Gardner*, Case No. 14-cr-20735-001 (E.D. Mich. July 22, 2020), 2020 U.S. Dist. LEXIS 129160, at *17-18.

50.    In summary, COVID-19 is present in the facility in which Eisenga is housed, the infections there are likely to persist and even worsen, and he possesses morbidities that put him at risk of contracting COVID-19 and, if he does, suffering more severely than would the average victim of the virus.

### *Standards Applicable to Sentence Reduction*

51.    Subsection 3582(c)(1)(A) of Title 18 provides that the court may

upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable, if it finds that—

extraordinary and compelling reasons warrant such a reduction…

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission;

52.    The statute, as adopted 30 years ago, limited the right to bring a § 3582(c)(1)(A) sentence reduction motion to the Director of the BOP. However, Section 603(b) of the *First Step*

---

[95]    Found at https://erj.ersjournals.com/content/erj/early/2020/03/17/13993003.00547-2020.full.pdf (last visited February 14, 2022).

*Act, supra,* stripped the BOP of its exclusive right to bring such motions, instead permitting prisoners to file the motions after a hybrid exhaustion of remedies with the agency.

53.     Nevertheless, U.S.S.G. §1B1.13 – the Sentencing Commission's pre-*First Step* policy statement on § 3582(c)(1)(A) sentence reduction motions – remains on the books, primarily because the Sentencing Commission has lacked a quorum since *First Step* was passed. This Circuit has joined many others in holding that Guideline § 1B1.13 is not binding where a prisoner has brought a § 3582(c)(1)(A)(i) motion. *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020). *See also United States v. Brooker*, 976 F.3d 228, 236 (2d Cir. 2020); *United States v. McCoy*, 981 F.3d 271, 281 (4th Cir. 2020); *United States v. Shkambi*, 993 F.3d 388 (5th Cir. 2021); *United States v. Jones,* 980 F.3d 1098, 2107 (6th Cir., 2020); *United States v. Gunn,* 980 F.3d 1178, 1180 (7th Cir. 2020); *United States v. Aruda*, 993 F.3d 797, 801 (9th Cir. 2021), and *United States v. Maumau*, 993 F.3d 821 (10th Cir. 2021). The lone holdout is *United States v. Bryant*, 996 F.3d 1243, 1265 (11th Cir., 2021), which held that §1B1.13 bind *all* § 3582(c)(1)(A)(i) motions.

54.     The *Gunn* court ruled that while a district court is obligated to follow "applicable policy statements" of the Sentencing Commission in deciding 18 U.S.C. § 3582(c)(1)(A) motions, "the Guidelines Manual lacks an 'applicable' policy statement covering prisoner-initiated applications for compassionate release. District judges must operate under the statutory criteria— 'extraordinary and compelling reasons]—subject to deferential appellate review. *Id.* at 980 F.3d 1181.

*Argument for Grant of Motion*

(a)      **Extraordinary and Compelling Reasons for Grant:**

55.      Eisenga suffers from a substantial list of co-morbidities. While the District Court was aware of some of these, at least, when Eisenga was sentenced on June 29, 2021, the President of the United States was declaring COVID-19 to be beaten.[96] Of course, it was not beaten: the Delta variant roared across America six weeks later, to be followed by Omicron in December. It now seems that variants will continue to arise (such as the Omicron BA.2), and that those variants may not be arrested by vaccines or immunity due to prior infections.

56.      What's more, the District Court sentenced Eisenga on the reasonable belief that he would be continued on the antimicrobial medicines that had been effective in treating his tickborne disease. Instead, the BOP has negated years of careful experimentation to find the appropriate drugs to ameliorate the pain and weakness of the disease, which BOP physicians admit they cannot identify but say they are sure it is not what Eisenga's private physicians studied for an extended period.

57.      Not only do Eisenga's co-morbidities leave him at a greater likelihood of suffering a more severe outcome from COVID, but he also suffers daily from the pain and weakness of an illness he had largely controlled prior to incarceration. Here, as in *Samy v. United States*, the district court held that "the persuasive precedent for granting compassionate release under the current circumstances is overwhelming." *Id.* at Case No. 16-20610 (E.D. Mich. Apr. 16, 2020), 2020 U.S. Dist. LEXIS 66864, at *10-12. Likewise, Eisenga's medical condition is compelling,

---

[96]      Jennifer Jacobs, *Biden Declares Success in Beating Pandemic in July 4 Speech* (BLOOMBERG, July 4, 2021), found at https://www.bloomberg.com/news/articles/2021-07-04/biden-to-appeal-for-vaccinations-after-u-s-missed-july-4-target (last accessed February 15, 2022).

leaving him at unacceptably high risk both of contracting COVID-19 in prison and of suffering

serious complications or death from the disease, not to mention effectively denying adequate

medical care that was the norm prior to his incarceration.

58.     Eisenga has been vaccinated, but he has not received a booster despite the CDC's

guidelines that adults get such boosters.[97] Regardless, his vaccination status is not relevant to

susceptibility to COVID omicron or its variants, none of which has been shown to not be

especially deterred by vaccines. This is especially so where the vaccine was administered well

more than 30 days ago. *See Wanwisa Dejnirattisai, et al., Reduced neutralisation of SARS-COV-2*

*Omicron-B.1.1.529 variant by post-immunisation serum, supra.*[98]

59.     Some courts have placed considerable weight on the BOP's self-proclaimed ability

to control the spread of the virus.[99] But the multiple breakouts at MCFP Springfield (20 dead);

FCI Butner Low (18 dead); FMC Fort Worth (16 dead); Devens FMC (13 dead); and FCI

Terminal Island (11 dead) and USP Tucson (12 dead) – not to mention the fact that one out of

---

[97]     CDC, *COVID-19 Booster Shots* (Feb. 2, 2022), found at
https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last accessed February 3, 2022).

[98]     In fact, Israel has been trying a fourth shot (a second booster). Nearly a month after Sheba
Medical Center launched a study to test the efficacy of such a shot, the hospital reported on January 17, 2022,
that a *fourth* booster "was only partially effective in protecting against the Omicron strain." *Israeli trial,
world's first, finds 4th dose 'not good enough' against Omicron* (TIMES OF ISRAEL, Jan. 18, 2022), found at
https://www.timesofisrael.com/israeli-trial-worlds-first-finds-4th-dose-not-good-enough-against-omicron/ (last
accessed January 18, 2022). *See also* Antony Sguazzin, *Early Omicron Breakthroughs Show MRNA Vaccines'
Weakness* (BLOOMBERG QUINT, February 14, 2022), found at https://www.bloombergquint.com/business/mrna-
boosters-don-t-block-omicron-south-african-study-shows (last accessed February 14, 2022).

[99]     This Court noted that BOP representations about administrative remedy exhaustion are
occasionally "incorrect[]." *Order* (Dkt.1149), *supra* at p.4, fn.18, *citing United States v. Richardson*, No. 2:17-
cr-00048-JAM, 2020 WL 3402410 at *2 (E.D. Cal. June 19, 2020) ("over the past few months, the BOP has—
on several occasions—incorrectly represented the status of inmates' exhaustion efforts. . . . the BOP's alleged
lack of records in this case [is] not [] controlling."). Given this, and the BOP declaring that it had vaccinated
thousands more at a third of its facilities than those facilities are holding (*see supra* at p.6, ¶8), one could fairly
ask why BOP representations should be entitled to any deference whatsoever.

three BOP inmates has contracted are evidence that the BOP's COVID-19 "action plan" in place throughout its institutional system is a Potemkin Village.[100]

60.    On January 21, 2022, Dr. Venters – who has inspected some 40 prisons since the pandemic began – testified that "my investigations have revealed a disturbing lack of access to care when a new medical problem is encountered… "[T]here's a compelling and unrealized rationale for release of high-risk patients who pose minimal public safety risks. This approach is even more important now to consider during the omicron outbreaks because of the tremendous lack of staffing inside facilities."[101] The BOP has not prevented the spread of the virus.  Senator Durbin is right: The BOP has failed to protect staff and inmates from COVID-19.[102]

61.    In *Wilson, supra*, Chief Judge R. Guy Cole wrote in dissent

> The BOP casts its overall response to COVID-19 as a "multiphase action plan."
> That phrase sounds good on paper; it conveys the message that the BOP is doing
> all that it possibly can to address the outbreak at Elkton. But it means little until
> we look behind the curtain and examine whether the plan's phases move the BOP
> closer to keeping the inmates safe. Such an examination here reveals that the
> BOP's six-phase plan to address COVID-19 is far less impressive than its title
> suggests. That plan consists of two different phases addressing the screening of
> inmates, an entire phase consisting of only taking inventory of the BOP's
> cleaning supplies, a phase where the BOP confined inmates to their quarters
> where they cannot socially distance, and a final phase that just extended the
> previous one. It turns out, then, that the "six-phase" plan is, for practical
> purposes, a four-phase plan where one phase is taking inventory of supplies and
> another involves the locking of inmates in 150-person clusters where they cannot
> access the principal method of COVID-19 prevention. Suffice to say, with stakes
> this high, the specifics matter far more than the headline. As another court
> observed, '[t]he government's assurances that the BOP's 'extraordinary actions'

---

[100]    BOP COVID-19 page, *supra.*

[101]    Testimony of Homer Venters, M.D. before the House Subcommittee on Crime, Terrorism, and Homeland Security, January 21, 2022, found at https://judiciary.house.gov/calendar/eventsingle.aspx?EventID=4827 at Minute 40:32 (last accessed February 14, 2022).

[102]    *Durbin Calls for Garland to Remove Federal Prisons Director, supra.*

can protect inmates ring hollow given that these measures have already failed to prevent transmission of the disease.'

62.     *Wilson, supra* at 961 F.3d 848 (Cole, C.J., dissenting), quoting *Rodriguez, supra* at 451 F. Supp. 3d 401. Despite the BOP's efforts, prison poses risks that are neither acceptable nor addressable for a prisoner in my condition. Witness the fact in the 23rd month of the BOP's plan in place, the BOP has gone from 15 infected inmates and 14 staff to 50,000 infected and "recovered" inmates and over 8,500 staff at a full 100% of its facilities.

63.     In June 2020 – at a time when the BOP recorded 1,710 sick inmates – BOP Director Carvajal confidently told the Judiciary Committee that "at this point, we have more recoveries than new infections. And I believe that this shows that we are now flattening the curve." Carvajal Senate Judiciary Committee testimony, *supra* at Minute 57:20. Six months later, with the BOP recording 4,674 sick inmates, he told the House Subcommittee that '[t]he Bureau has a sound pandemic plan in place and a well-established history of managing and responding to various types of communicable disease outbreaks." *Written Statement of Michael Carvajal, supra* at p.4. Now, almost 20 months later, the BOP has over 7,700 sick inmates, and at least 300 inmates dead.

64.     Two Circuits recently held that where an inmate has access to the COVID-19 vaccine, that fact "substantially undermines [his] request for a sentence reduction." *United States v. Lemons,* 15 F.4th 747, 751 (6th Cir., 2021). *See also United States v. Broadfield,* 5 F.4th 801, 803 (7th Cir. 2021) (incarceration during the COVID-19 pandemic, where defendant has access to the COVID-19 vaccine, does not present an "extraordinary and compelling reason" warranting a sentence reduction). the holding is based on the courts' analysis that "to the extent prisons do offer some unique challenges, the vaccine now significantly reduces the risks associated with

COVID-19." *Lemons, supra.* The *Lemons* court characterized the holding as occurring at the "intersection of law and science." *Id.*

65.   The 6th and 7th Circuit's legal rationale has been overtaken by the facts. The evidence shows that

- Eisenga has not had access to the booster shot that someone with his co-morbidities should have received.

- Vaccines did not prevent substantial "breakthrough" infection at FCI Texarkana, as determined by the CDC. *See* Hagan, *Outbreak of SARS-CoV-2 B.1.617.2 (Delta) Variant Infections Among Incarcerated Persons in a Federal Prison — Texas, July–August 2021, supra*;

- vaccines have been found by science to provide protection for a much lesser period than originally predicted;

- over half of BOP inmate deaths since March 2020 have been of people who had previously had COVID with substantially lesser effect, but were reinfected and died of the disease;

- all of the evidence shows that COVID omicron finds lesser resistance among those with prior COVID infections and is resistant to even two doses of vaccine; and

- currently, the BOP maintains that at 41 of its facilities, it has vaccinated nearly 4,000 more inmates than the facilities even have.

There is no factual basis for the *Lemons* or *Broadfield* holdings, and this Court should decline to follow their reasoning, which – most charitably put – has been overcome by events. *See Brunetti supra,* on the omicron variant: "The Court disagrees with the Government's assertion that Brunetti's vaccination status, considered in isolation, 'substantially weak[ens]' his claim that his medical conditions constitute extraordinary and compelling reasons warranting his release." *See also Highsmith, supra* at 2022 U.S. Dist. LEXIS 10786, at *6-7 (court rejects government argument about vaccinations, holding that "[a]pproximately 90% of the inmates there are fully inoculated.... However, breakthrough infections of COVID-19 among fully vaccinated persons

remain, particularly with the highly contagious Omicron variant," citing CDC, *Omicron Variant: What You Need to Know*).[103]

### (b)    Section 3553 Factors

66.    In deciding an 18 U.S.C. § 3582(c)(1)(A) motion, the Court is required to "consider[]" the 18 U.S.C. § 3553(a) sentencing factors." Those factors include the nature and circumstances of the offense and the history and characteristics of the defendant, and the need for the sentence imposed—

- to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
- to afford adequate deterrence to criminal conduct;
- to protect the public from further crimes of the defendant; and
- to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*Id.* The Court weighed those facts when it sentenced Eisenga. But at that time, the Court (as was everyone else) was being told by the government that the pandemic was over, and it believed that Eisenga would receive sufficient care to prevent him from becoming disabled with weakness and pain.

67.    In this *Motion,* Eisenga seeks a reduction in sentence that effectively causes him to serve the balance of his sentence on home confinement, where he can obtain and pay for his own medical care that complies with accepted standards for competence and promptness of delivery. On home confinement, he will be subject to electronically-monitored supervision of the U.S. Probation Office and will be restricted to his residence except for activities approved in advance

---

[103]     CDC publication found at https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last visited February 14, 2022).

by the Probation Officer. He seeks essentially a sentence of home confinement for a term of up to remaining 123 months or so of his sentence, to be followed by the currently-imposed term of supervised release. *See Sentencing Monitoring Computation Data,* attached as **Exhibit 4** (release date August 23, 2024, or sooner – depending on *First Step Act* credits) – about 29 months from now.

68.     Sending Eisenga to supervised release with a decade of home confinement is fully within the Court's authority under § 3582(c)(1)(A). *See, e.g., United States v. Bonner,* Case No. 16-cr-20055 (E.D. Mich. Feb. 2, 2021), 2021 U.S. Dist. LEXIS 19062, at *2 (defendant resentenced to time served, supervised release term extended, and defendant placed on 12 months' home confinement). Restriction to his residence for a period equal to the remainder of his term of incarceration term is unlikely to undercut respect for the law or suggest that the offense was not serious. *See* 18 U.S.C. § 3553(a)(2)(A) and (B). His conduct will be closely controlled until the end of his good-time release date plus three years of supervised release, thus protecting the public. *See* 18 U.S.C. § 3553(a)(2)(C).

69.     Consideration of the § 3553(a) factors begins with the offense. Eisenga defrauded Alliant Credit Union by submitting a document that falsely purported to be a lease of property Eisenga controlled to a major grocery store chain that he knew was not going to open in the facility. He did so in order to obtain the financing needed to develop and open an anchor grocery store. Later, when he was unable to find a tenant for the facility, his company defaulted on the $6.9 million loan. Eisenga falsified a lease cancellation agreement, purporting to be an agreement terminating his company's lease to the grocery chain.

70.     When Eisenga learned that Alliant was questioning the defaulted loan, he reasonably believed that discovery of the fraud was inevitable. He consulted several attorneys. Two advised him to wait for the ax to fall. The third attorney told him to tell Alliant what he had

done, and within two days, Eisenga authorized the attorney to reveal everything to Alliant's in-house counsel. Between the time Eisenga admitted his fraud and sentencing, he took a number of steps to make payments in restitution despite the fact that no restitution had yet been ordered.

71.     The nature of the offense is a central factor in a § 3553(a) assessment, but so is the history and characteristics of the offender. It may happen from time to time that a court considering compassionate release will focus on the offense to the exclusion of what has happened since the offense and conviction. As Chief Judge Roger L. Gregory persuasively argued in *United States v. Kibble*, 992 F.3d 326 (4th Cir. 2021):

> The text of § 3553(a) does not make any factor, or combination of factors, dispositive... I disagree with the Government's suggestion that a district court may fulfill its duty to reconsider the § 3553(a) factors by merely recounting the considerations that supported the original sentence. Section 3582(c)(1) necessarily envisions that the § 3553(a) factors may balance differently upon a motion for compassionate release than they did at the initial sentencing. An individual requesting compassionate release will, in all cases, be serving a sentence that a district court once held was "sufficient but not greater than necessary." If a district court's original § 3553(a) analysis could always prove that a sentence reduction would intolerably undermine the § 3553(a) factors, then 18 U.S.C. § 3582(c)(1) would, in effect, be a nullity.

*Id.* at 992 F.3d 335 (Gregory, C.J., concurring).  Consideration of the nature of the offense alone does not do justice to the § 3553(a) factors. Rather, the issue should be to assess whether "the defendant's circumstances are so changed... that it would be inequitable to continue the confinement of the prisoner." *Ebbers, supra.*  A court must "determine what weight, if any, to give these considerations in evaluating whether they out-weigh the Section 3553 factors supporting Defendant's sentence." *United States v. Cleveland*, Case No. 12-CR-6109 (W.D.N.Y. Sep. 23, 2020), 2020 U.S. Dist. LEXIS 174932, at *3, citing *Ebbers, supra.*

72.     The Court should consider not just the offense, but the fact that Eisenga had no prior record, that he voluntarily admitted his misconduct to the victim, that he voluntarily liquidated assets to make payments in restitution even before sentencing, and that service of a

44

sentence in pain and weakness, and with risk of contracting a dangerous disease, is service of a sentence in conditions not contemplated by the Sentencing Guidelines or this court.

73.    Despite his medical conditions, which makes some work impossible, immediately upon coming to prison, Eisenga was assigned to operate the institution tool room. The job entails substantial responsibility, because tools must be issued to inmates only as authorized and documented, and all tools must be accounted for at the end of the morning shift and at the end of the workday. It is a position held by a BOP employee unless a suitably responsible inmate can be found.

74.    Eisenga is active in leading a nightly Bible study and prayer group, sharing responsibility for preparing lessons and leading discussions on the topics. He has been actively completing all programming available to inmates at the facility, including adult continuing education and ACT courses. He currently is completing Money Smart and Work Keys ACT programming.

75.    Eisenga has maintained good family and community ties.  Such ties are a strong factor in a prisoner's success after release, and they have been cited as substantial evidence in favor of compassionate release. *United States v. Redd*, 444 F. Supp. 3d 717, 730 (E.D. Va. 2020).

76.    The *First Step Act* required the Dept. of Justice to develop "a risk and needs assessment system, which shall be used to… determine the recidivism risk of each prisoner as part of the intake process, and classify each prisoner as having minimum, low, medium, or high risk for recidivism… assess and determine, to the extent practicable, the risk of violent or serious misconduct of each prisoner… [and] determine the type and amount of evidence-based recidivism reduction programming that is appropriate for each prisoner and assign each prisoner to such programming accordingly, and based on the prisoner's specific criminogenic needs…" *Id.* at § 101(a), 132 Stat. 5197, *codified* at 18 U.S.C. § 3632(a). Pursuant to its mandate, the Dept. of

Justice took "informed and proactive steps to study, develop, and publish a "robust risk and needs assessment system" which it has christened the *Prisoner Assessment Tool Targeting Estimated Risk and Needs* system ("PATTERN"). Dept. of Justice, *The First Step Act of 2018: Risk and Needs Assessment System* (July 19, 2019) ("PATTERN I") at pp. 21, 43.[104] The DOJ states that "the PATTERN instrument is an assessment designed to predict the likelihood of general and violent recidivism for all BOP inmates over a three-year follow-up period." PATTERN I at p. 43. DOJ has expressed its "confidence in the accuracy of PATTERN." PATTERN II, *supra* at p.2.

77.     Although the Court need not make an 18 U.S.C. § 3142(g) "dangerousness" determination, protection of the public from further offenses of a defendant is a sentencing factor. Eisenga had a Criminal History of I prior to his offense. He is now removed from the crime by 14 years, and he has several serious medical limitations that make further criminal conduct unlikely, even if he desired to do so. *See, e.g.*, *United States v. Alvarado*, Case No. 16-cr-00940, 2020 (S.D. Cal. Aug. 31, 2020), U.S. Dist. LEXIS 159291, at *8-9 (Given defendant's medical condition, the chance of recidivism "at this point of his life is unlikely... The likelihood of [defendant] posing a significant danger to the community is also greatly reduced because of his medical condition. Certainly, if he were to commit an offense again in the future, he knows that he is likely to die in prison").

78.     Beyond the medical condition, Eisenga's *PATTERN* score is "minimum " for recidivism and violence. The *First Step Act* required the Dept. of Justice to develop "a risk and needs assessment system, which shall be used to... determine the recidivism risk of each prisoner

---

[104]     Found at https://nij.ojp.gov/sites/g/files/xyckuh171/files/media/document/the-first-step-act-of-2018-risk-and-needs-assessment-system_1.pdf (last visited January 12, 2022). PATTERN was modified and adopted in final form on January 15, 2020. Dept. of Justice, *The First Step Act of 2018: Risk and Needs Assessment System Update - January 2020* (January 15, 2020) ("PATTERN II"). Found at https://www.bop.gov/inmates/fsa/docs/the-first-step-act-of-2018-risk-and-needs-assessment-system-updated.pdf (last visited January 12, 2022).

as part of the intake process, and classify each prisoner as having minimum, low, medium, or high

risk for recidivism... assess and determine, to the extent practicable, the risk of violent or serious

misconduct of each prisoner... [and] determine the type and amount of evidence-based recidivism

reduction programming that is appropriate for each prisoner and assign each prisoner to such

programming accordingly, and based on the prisoner's specific criminogenic needs..." *Id.* at §

101(a), 132 Stat. 5197, *codified* at 18 U.S.C. § 3632(a). *Needs Assessment System* (July 19, 2019)

("PATTERN I") at pp. 21, 43.[105]

79.     Eisenga's PATTERN score is "minimum" for both risk of recidivism and violence,

meaning that his odds of falling into recidivism are under 10%, and the odds that he will commit a

violent offense are only 2%. PATTERN I, *supra* at pp. 50-53. While the PATTERN score alone

does not conclusively show that the public needs protection from Eisenga, that – coupled with his

lack of prior criminal history, conduct while on pretrial release and in prison, including self-

surrender to the institution – make a strong case that the public will be amply protected if he is

sent to supervised release and mandatory home confinement.

80.     Eisenga has a release plan if placed on supervised release and ordered to home

confinement. Eisenga would live at the home already approved by the U.S. Probation Office, and

remained on home confinement except as approved by the Probation Officer, including

employment. He will work to rebuild and maintain his businesses in order to complete his

restitution obligation as quickly as possible.

---

[105]     Found at
https://nij.ojp.gov/sites/g/files/xyckuh171/files/media/document/the-first-step-act-of-2018-risk-and-needs-
assessment-system_1.pdf (last visited January 12, 2022). PATTERN was modified and adopted in final form on
January 15, 2020. Dept. of Justice, *The First Step Act of 2018: Risk and Needs Assessment System Update -
January 2020* (January 15, 2020) ("PATTERN II"). Found at https://www.bop.gov/inmates/fsa/docs/the-first-
step-act-of-2018-risk-and-needs-assessment-system-updated.pdf (last visited January 12, 2022).

81.    In weighing whether home confinement will provide just punishment, reflect the seriousness of the offense, and promote respect for the law, the Court should consider that in Sec. 12003(b)(2) of *The CARES Act, supra,* Congress directed the BOP to release what ultimately totaled over 37,000 inmates to home confinement without the agency to consider *any* of the § 3553 factors.[106] Indeed, the BOP considers home confinement to be, "a form of incarceration for persons convicted of crimes who are still serving a federal sentence..." *Written Testimony of Michael Carvajal, supra* at p.6. One such releasee was Paul Manafort – whose multiple offenses spanned tax fraud, bank fraud, conspiracy to defraud the United States, witness tampering (after his indictment) and obstruction of justice – to home confinement from FCI Loretto pursuant to the Bureau's authority under *The CARES Act.*[107]

82.    In adopting § 12003(b)(2) of *The CARES Act,* Congress did not mandate that the BOP reflect on the § 3553(a) sentencing factors in making home confinement placement decisions. Yet in 18 U.S.C. § 3582(c)(1)(A), Congress explicitly directed that in considering a sentence reduction, courts consider "the factors set forth in Section 3553(a) *to the extent that they*

---

[106]    BOP, *COVID-19 webpage, supra.*

[107]    In Case No. 1:17cr201 in the U.S. District Court for the District of Columbia, Mr. Manafort was convicted of conspiracy to defraud the United States of over $6.1 million in federal taxes and conspiracy to engage in witness tampering. The government averred that even after signing a plea agreement, Mr. Manafort lied to the FBI. *Sentencing Memorandum,* Dkt.528 (Case No. 1:17cr201), filed February 26, 2019, at p.2. He was sentenced to 73 months incarceration, 30 of which concurrent with a sentence handed down in the Eastern District of Virginia (Case No. 1:18cr83). *Judgment,* Dkt.556, December 22, 2019.
    In the Virginia case, Mr. Manafort was convicted of five counts of filing false income tax returns, one count of failing to report foreign bank accounts, and two counts of bank fraud. He caused a tax loss of about $25.5 million. The court sentenced him to 47 months. *Judgment,* Dkt.326 (Case No. 1:18cr83), December 7, 2019. Aggregated with his sentence in Case No. 1:17cr201, Mr. Manafort was to serve 90 months.
    After serving about seven months on home confinement, Mr. Manafort was pardoned on December 23, 2020, by President Trump.

*are applicable.*" (Emphasis added). Congress knows how to draft statutes, and it is perfectly capable of directing that § 3553(a) factors be considered when it believes that such consideration is warranted. *See e.g., Charter Communications Entertainment I, LLC v. Burdulis,* 367 F. Supp.2d 16, 25 (D. Mass. 2005) (in case involving statutory interpretation of *Communications Act of 1934,* as amended, court rules that "communication by radio" used in 47 U.S.C. § 153(33) does not include signals delivered by coaxial cable, because other statutory definitions "demonstrate that Congress is perfectly capable of using the word 'cable' when it intends to, and it chose not to do so when defining a 'communication by radio'"); *United States v. Matassini,* 565 F.2d 1297, 1309 n.26 (5th Cir. 1978) ("Congress is perfectly capable of making the application of a federal statute dependent on state law"); *Annachamy v.  Holder,* 686 F.3d 729, 738 (9th Cir. 2012) (Court observed that "Congress was perfectly capable of adopting a 'voluntariness' limitation where it felt that one was necessary is plain from comparing § 2(a) with § 2(b), which excludes only those individuals who '*voluntarily* assisted the enemy forces… in their operations'," quoting *Fedorenko v. United States,* 449 U.S. 490, 512 [1981]). The absence of a directive that § 3553(a) factors be considered by the BOP in making home confinement decisions thus suggests that such are unnecessary because home confinement is a *continuation,* not a termination, of the sentence of incarceration.

83.    While the *CARES Act* does not authorize a federal court to place Eisenga on home confinement, it is instructive to note that Congress did not see an administrative transfer of a prisoner to home confinement to be a matter with § 3553(a) implications, just as the Department of Justice did not view Mr. Manafort's transfer to home confinement as an event with substantial

§ 3553(a) implications. This is so even where the home confinement can continue until the end of the prisoner's sentence, regardless of its length or the abatement of the coronavirus emergency.[108]

84.     It likewise stands to reason that placing Eisenga on home confinement for a term equal to the remainder of his sentence would be seen by the government (and especially Congress) as having limited § 3553(a) impact if done under the *CARES Act*. There is no substantive difference between the Court placing Eisenga on home confinement under a special condition of supervised release and the BOP placing Eisenga there under the *CARES Act*. In fact, insofar as a public perception is concerned, the public was much more aware of Mr. Manafort's high-profile case, and would be more likely to question whether his transfer to home confinement promoted respect for the law and was just punishment than it is likely to question placing Eisenga on home confinement in Alabama.[109] *See, e.g., United States v. Cantu*, 423 F. Supp. 3d 345, 354-55 (S.D. Tex. 2019) (granting a defendant sentence reduction while imposing home confinement on supervised release "adequately expresses the seriousness of the offense, deters criminal conduct, and protects the public"). Courts have acknowledged that release to home incarceration can nonetheless "reflect the seriousness of the offenses, promote respect for the law, and provide just punishment for the defendant's crimes," *United States v. White*, Case No. 2:17-cr-00198-4

---

[108]     On December 21, 2021, the Department of Justice Office of Legal Counsel issued an opinion that persons on home confinement under the CARES Act may continue their home confinement until the end of their sentences, despite the ending of the national pandemic emergency. *See* Dept. of Justice Office of Legal Counsel, *Discretion to Continue the Home-Confinement Placements of Federal Prisoners After the COVID-19 Emergency* (December 21, 2021), found at https://www.justice.gov/olc/file/1457926/download (last accessed February 14, 2022).

[109]     Given that fact, and the fact that Congress has authorized use of home confinement in 18 U.S.C. § 3624(c)(2) and §12003(b)(2) of the *CARES Act* without regard to § 3553(a) factors, it is clear that a transfer to home confinement – even through the vehicle of supervised release – simply does not implicate the issues of the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from any further crimes, set out in § 3553(a). Thus, sending a defendant to home confinement falls on the outside of the "to the extent that they are applicable" language of § 3582(c)(1)(A).

(S.D.W.Va. June 12, 2020), 2020 U.S. Dist. LEXIS 103974, at *16 *citing United States v.*

*Campagna*, Case No. 16cr78-01 (S.D.N.Y. Mar. 27, 2020), 2020 U.S. Dist. LEXIS 54401, at *1,

9). One court observed that "[i]n some respects, home confinement will result in less freedom of

movement than [the defendant] would have in a prison environment that offers large recreational

areas and educational opportunities." *United States v. Young*, Case No. CR19-5055 (W.D. Wash.

May 22, 2020), 2020 U.S. Dist. LEXIS 90537, at *11. *See also United States v. Springer*, Case

No. 20-5000 (10th Cir. July 15, 2020), 2020 U.S. App. LEXIS 21947, at *3-4 (defendant's

"transfer to home confinement is not a release from imprisonment, nor does this transfer reduce

the length of his custodial sentence... [E]ven though a prisoner is... in home confinement, he is

still serving a 'term of imprisonment.' When read together, [18 U.S.C. §§ 3621 and 3624(c)]

plainly indicate that a person is in the BOP's 'custody' while serving the remainder of a sentence

in home confinement" (internal citation omitted)). *See also Melot v. Bergami*, 970 F.3d 596, 599

and n.13 (5th Cir. 2020) (placement of a prisoner by BOP in home confinement under 34 U.S.C. §

60541(g) "elderly offender home detention program" is a "change in confinement from a prison

facility to home detention" and is properly considered to be a change in "conditions of

confinement" that cannot be challenged in a 28 U.S.C. § 2241, a conclusion that is "consistent

with 18 U.S.C. § 3621, which gives the BOP the authority and discretion to designate the place of

a convicted offender's confinement").

85.    Courts have found that placement in home confinement for a portion of a

prisoner's term of supervised release provides protection to the public and otherwise serves the 18

U.S.C. § 3553 sentencing factors. In *Gardner, supra* at 2020 U.S. Dist. LEXIS 129160, *24, the

court held that imposition of a term of home confinement as a condition of supervised release

would "afford an additional protection to the public." *See also United States v. Hoover*, Case No.

5:16-cr-58 (D.Vt. May 18, 2020), 2020 U.S. Dist. LEXIS 126763, at *6-7 ("There is reason for

optimism that under supervision, Mr. Hoover will remain on the right side of the law"); *United States v. Pomante*, Case No. 19-20316 (E.D. Mich. May 15, 2020), 2020 U.S. Dist. LEXIS 85626, at *21-23 ("The Court also agrees that proper safeguards would ensure that Defendant continues to serve his term to completion and comply with Court guidelines. The Court reduces Defendant's term of imprisonment portion of his sentence to time served, and the Court imposes a term of supervised release equal to the unserved portion of his original term of imprisonment"); *Sawicz, supra* at 453 F.Supp.3d 606 (defendant serving term for child pornography and supervised release violation resentenced to time served, with court holding that "[u]pon his release from prison, the defendant will quarantine himself at home with his parents; assuming that he complies with that directive – and I have no reason to believe that he would not – he would pose little, if any, risk to the public"); *United States v. Burnside*, Case No. 18-CR-2068, 2020 U.S. Dist. LEXIS 112708, at *30-32 (N.D. Iowa June 18, 2020) ("[T]he continued restrictions imposed on [defendant] through home confinement and supervised release, together, satisfy the goal of imposing sufficient punishment. Releasing defendant under these circumstances would not undermine the goal of deterrence").

86.    District courts lack the authority to directly modify the *method* of imprisonment during a term of incarceration. *See e.g., United States v. Perez-Asencio,* Case No. 18-CR-3611-H (S.D. Cal. Feb. 14, 2019) 2019 U.S. Dist. LEXIS 24430, at *7-8, 2019 WL 626175 ("§ 3582(c)(1)(B) only 'permits courts to modify an imposed term of imprisonment, not the method of incarceration'"). But this Court can effect the same result by reducing Eisenga's remaining sentence to time served, expanding the supervised release term, and imposing a condition of home confinement on the expanded supervised release term. Such an order is fully consistent with 18 U.S.C. § 3582(c)(1)(A). *United States v. Al-Jumail*, 459 F. Supp. 3d 857, 866 (E.D. Mich. 2020) (Court reduced defendant's term of imprisonment portion of his sentence to time served, and

imposed a term of supervised release equal to the unserved portion of his original term of

imprisonment); *Gardner, supra* at 2020 U.S. Dist. LEXIS 129160, *25 (As condition of

compassionate release, defendant restricted to his residence, according to a curfew as directed by

the probation officer, for at least six months); *United States v. Cannon*, Case No. 15-20783 (E.D.

Mich. Oct. 5, 2020), 2020 U.S. Dist. LEXIS 183984, at *17  (Reducing a sentence to time served,

the court imposed a new term of supervised release equal to the unserved portion of the original

term of imprisonment, following which the defendant would serve the previously-imposed term

of supervised release with the first 12 months of expanded supervised release to be served on

home confinement); *United States v. Gonzalez,* Case No. 2:18cr232 (E.D.Wash. December 31,

2020), 2020 U.S. Dist. LEXIS 56422 at *10; *United States v. Atkinson*, Case No. 2:19-CR-55

(D.Nev. Apr. 17, 2020), 2020 U.S. Dist. LEXIS 68240, at *10 (same procedure followed); and

*United States v. Mogan*, Case No. 14-040 (E.D. La. May 19, 2020), 2020 U.S. Dist. LEXIS

88511, at *7 ("[U]pon finding a petitioner has satisfied the compassionate release statute,

including the mandatory exhaustion requirements of § 3582(c)(1)(A), the court may consider

reducing the petitioner's term of imprisonment to time-served and modifying the existing term of

supervised release to add a period of home confinement," citing U.S.S.G. § 5F1.2; 18 U.S.C. §

3583(e)(2)).

### *Conclusion*

87.    Eisenga has six separate morbidities that make him susceptible to this or the next

or the next or the next variant of COVID-19.  Both his condition and substandard treatment for

his immunosuppressive disease constitute extraordinary and compelling reasons for a sentence

reduction. Considering Eisenga's medical condition, his rehabilitation, his history and

characteristics, the inadequate medical care he has received and the pain and weakness the BOP

seems to be willing to let him experience for the remainder of his sentence, no one could

reasonably argue that home confinement would be a gross departure from an acceptable sentence. his time in prison has been insufficient. Eisenga's history and PATTERN score suggest that resentencing him to what is essentially a term of home confinement will not demean the seriousness of the offense. Release to home confinement at this time will not offend 18 U.S.C. § 3553(a) and is necessary to address extraordinary and compelling circumstances, within the meaning of 18 U.S.C. § 3582(c)(1)(A)(i).

WHEREFORE, this *Motion* should be granted, and Eisenga should be resentenced to time served, with his supervised release expanded by about 29 months, conditioned on his spending those months on home confinement and successfully adhering to all conditions of supervised release.

Date: March 9, 2022

William H. Gergen, SBN 1003061

**Gergen, Gergen & Pretto, S.C.**
105 Front Street
P.O. Box 453
Beaver Dam, WI  53916
Ph:  920-887-0371
Fax:  920-887-2398